**SMILEY WANG-EKVALL, LLP**
Robert S. Marticello, State Bar No. 244256
*rmarticello@swelawfirm.com*
Michael L. Simon, State Bar No. 300822
*msimon@swelawfirm.com*
Timothy W. Evanston, State Bar No. 319342
*tevanston@swelawfirm.com*
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:   714 445-1000
Facsimile:    714 445-1002

Proposed Counsel for Equaltox, LLC, Debtor and Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>EQUALTOX, LLC, a California limited liability company,<br><br>Debtor and<br>Debtor-in-Possession. | Case No. 8:23-bk-12243-SC<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ORDER:**<br><br>**(A) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING OR DISCONTINUING SERVICE;**<br><br>**(B) DEEMING UTILITIES ADEQUATELY ASSURED OF FUTURE PERFORMANCE; AND**<br><br>**(C) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT UNDER 11 U.S.C. § 366; AND**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Supporting Declarations of Sulaiman Masood and Josh Teeple Filed Concurrently Herewith]**<br><br>**[Hearing to be Set]** |

2958964.1

EMERGENCY MOTION RE
UTILITY PROVIDERS

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................. 3

II. BACKGROUND ............................................................................................................... 4

    A. The Debtor and Its Operations ............................................................................. 4

    B. Events Leading to the Instant Case ...................................................................... 5

        1. Anthem's Violation of the Unfair Competition Law ................................ 5

        2. Anthem's Civil Lawsuit Against the Debtor ............................................ 6

        3. The Jury's Tainted Verdict and Resulting Appeal ................................... 8

    C. Anthem Rejected Mediation and Settlement Efforts .......................................... 10

    D. The Debtor's Chapter 11 Strategy ....................................................................... 11

III. REQUESTED RELIEF .................................................................................................... 11

IV. BASIS FOR RELIEF UNDER SECTION 366 OF THE BANKRUPTCY CODE ........... 13

V. CONCLUSION ................................................................................................................ 16

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2958964.1                                i                          EMERGENCY MOTION RE
UTILITY PROVIDERS

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adelphia Business Solutions, Inc.*,
    280 B.R. 63 (Bankr. S.D.N.Y. 2002) .................................................................................. 14, 15

*In re Magnesium Corp. of America*,
    278 B.R. 698 (Bankr. S.D.N.Y. 2002) ...................................................................................... 15

*In re Pacific Gas & Elec. Co.*,
    271 B.R. 626 (N.D. Cal. 2002) .................................................................................................. 14

*Shirley v. Philadelphia Elec. Co. (In re Shirley)*,
    25 B.R. 247 (Bankr. E.D. Pa. 1982) ......................................................................................... 14

*Virginia Electric & Power Co. v. Caldor, Inc.*,
    117 F.3d 646 (2d Cir. 1997) ............................................................................................... 13, 14

**STATUTES**

11 U.S.C. § 105(a) .............................................................................................................. 11, 15

11 U.S.C. § 366 ...................................................................................................... 3, 11, 13, 15

11 U.S.C. § 366(a) ...................................................................................................................... 13

11 U.S.C. § 366(b) .............................................................................................................. 13, 14

11 U.S.C. § 366(c) ...................................................................................................................... 14

11 U.S.C. § 366(c)(1)(A) ........................................................................................................... 14

**TREATISES**

2 Collier On Bankruptcy ¶ 105.01, at 105-5 to 105-6 (15th rev. ed. 2001) .................................... 15

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE:**

Equaltox, LLC, the debtor and debtor-in-possession in the above-captioned case (the "Debtor"), submits this *Emergency Motion for Order (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance; and (C) Establishing Procedures for Determining Adequate Assurance of Payment Under 11 U.S.C. § 366* (the "Motion"). In support of the Motion, the Debtor submits the following memorandum of points and authorities and the concurrently-filed declaration of Sulaiman Masood and Josh Teeple.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

In the ordinary course of business, the Debtor uses electricity, water, trash, medical waste management, and water treatment services provided by various utility companies (collectively, the "Utility Providers"). The continued and uninterrupted use of these utilities is essential to the Debtor's ability to sustain operations. Prior to the filing of the petition, the Debtor generally paid the Utility Providers' bills on a regular and timely basis. A non-exhaustive list of the Utility Providers that provide utility services to the Debtor as of the petition date and the estimated monthly payments to each is attached hereto as Exhibit "1." To continue day-to-day operations in the most cost-effective and least disruptive manner, the Debtor must ensure that its utility services are not interrupted. Because the Debtor cannot operate without utility services, it is critical that the Debtor obtain emergency authorization for the relief requested herein and further relief as is just and proper under the circumstances. Accordingly, and as further detailed herein, the Debtor respectfully requests that the Court enter an order: (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurances of future payment.

## II. BACKGROUND

### A. The Debtor and Its Operations

The Debtor is a state of the art clinical laboratory licensed by the California Department of Public Health, providing the communities it serves with essential services. *See* equaltox.com. The Centers for Medicare and Medicaid Services and Commission on Office Laboratory Accreditation have accredited the Debtor to perform laboratory tests for medical diagnosis and treatment, as well as toxicology and other similar tests, such as COVID-19 tests. For example, the Debtor provides COVID-19 testing for three shelters in Orange County every Thursday (Anaheim, Santa Ana, and Fullerton). As a toxicology laboratory, the Debtor provides tests related to the treatment of mental health disorders, alcoholism, and other substance abuse disorders.

Sulaiman Masood ("Masood") is the sole manager and owner of the Debtor. Masood was born in 1980 in Kabul, Afghanistan and immigrated to the United States when he was seven years old. The first in his family to attend college, Masood graduated in 2007 from Loma Linda University with a PharmD degree. Ahmad Ali Kohzad ("Kohzad") is Masood's first cousin and is also a pharmacist employed by the Debtor.

On October 20, 2015, Masood filed the Debtor's Articles of Organization with the California Secretary of State, forming the Debtor as a California limited liability company. The Debtor owns its office located at 550 N. Golden Circle Dr., Santa Ana, California 92705 (the "Golden Circle Property"). The Debtor acquired the Golden Circle Property in March 2023 with two loans from Sunwest Bank, one secured by a first trust deed in the amount of $1,562,200 and another secured by a second trust deed in the amount of $1,249,760. In May 2023, the second-in-position loan was repaid via a SBA 504 loan by California Statewide Certified Development Corporation. The Debtor currently employs 20 persons. This includes members of Masood's family who work for the Debtor.

The Debtor's annual revenue for 2022 was $13,990,089.60 and its revenue through October 27, 2023 (*i.e.*, the petition date) was $5,458,116.43. The Debtor's revenue for 2022 was higher due in large part to a contract with San Bernadino County to provide it with COVID-19 testing.

The Debtor receives payment for its services largely from insurers, including Medicare, Medical, Cigna, Aetna, and many others, and also from private parties. Other than the litigation with Anthem discussed below, the Debtor has not experienced issues with any other insurer.

### B. Events Leading to the Instant Case

#### 1. Anthem's Violation of the Unfair Competition Law

The Debtor provided medically necessary laboratory services to hundreds of individuals insured by Anthem. Anthem designates certain providers as "in-network," meaning they have contracted with Anthem to provide medical care to its insureds, or "out of network." The Debtor—like many other providers—is "out of network" and does not have a direct contractual relationship with Anthem.

While the Debtor does not have a contract directly with Anthem, it is the Debtor's normal practice to obtain a written assignment of benefits from each of the hundreds of insureds it provides services for. Through these assignments, the insureds assign to the Debtor their rights to (1) the payment of claims for services the Debtor renders relating to the insureds and (2) the enforcement of any rights in any proceeding relating thereto. Accordingly, the Debtor submitted claims to Anthem relating to the laboratory services it provided, with each claim form indicating that the Debtor performed the subject services and that the Debtor was submitting the claims as the insureds' assignee.

In or about March 2016, soon after the Debtor invoiced Anthem for the laboratory samples it had processed for its insureds on an out-of-network basis, Anthem placed the Debtor on "prepayment review." Specifically, Anthem placed the Debtor on prepayment review for laboratory services submitted under Healthcare Common Procedure Coding System (HCPCS) code G0483. This particular code relates to a specific service—drug testing, *i.e.*, laboratory samples related to treatment for substance abuse disorders.

As its basis for placing the Debtor on prepayment review, Anthem claimed, among other things, billing irregularities. According to Anthem, it noticed an incorrect billing code submitted eight times for a single patient. A third party billing company who handled the Debtor's billing at

the time—not the Debtor—submitted the incorrect billing code.  Despite the mistake, Anthem was not overcharged.  Anthem flagged for review all claims for reimbursement with HCPCA code G0483 by the Debtor submitted under the Debtor's tax identification number ("TIN").  Anthem kept the Debtor on prepayment review for as long as it continued to seek payment for the processing of laboratory samples related to treatment of substance abuse disorders; once the Debtor stopped submitting those samples, Anthem removed the Debtor from prepayment review.

Prepayment review allows Anthem to delay payment indefinitely.  Anthem's prepayment review requests that a provider submit medical records with each claim to support the billing of the claim.  In theory, Anthem pays the claim after receiving the requested medical records.  In practice, payment of claims under prepayment review is the exception, not the norm.  Through the prepayment review process, Anthem not only demands that healthcare providers furnish substantial additional information related to each claim, Anthem also repeatedly requests the same documents and information through its myriad of departments.  This byzantine process results in indefinite delays.  Moreover, by delaying payment of claims, Anthem effectively denies the claims and avoids payment.  In effect, Anthem's prepayment review process is designed to bolster its own profits by driving healthcare providers to enter into Anthem's network or risk shuttering operations.  As alleged by the Debtor in its appeal detailed later on, Anthem's practice stifles competition and is a violation of the Unfair Competition Law (Cal. Bus. And Prof. Code §§ 17200 et seq.).[1]

### 2.    Anthem's Civil Lawsuit Against the Debtor

Pre-petition, on May 18, 2018, Anthem sued the Debtor, Masood, Kohzad, and others, alleging fraud, violation of California's Unfair Competition Law, and other claims in the Superior Court of California, Case No. 30-2018-00993688-CU-FR-CJC.  Specifically, Anthem alleged that the Debtor submitted billings for laboratory services performed with HCPCS code G0483 through separate entities with a different TIN (alleged "pass-through entities") to avoid the prepayment

---

[1] Even before Anthem placed the Debtor on prepayment review due to a billing code error, Anthem arbitrarily refused to pay for any tests by the Debtor due to "historic fraud" related claims for substance abuse treatment.

review. According to Anthem, the claims submitted were fraudulent because, among other things, the claim forms (known as CMS-1500 forms) asserted that the laboratory services at issue were "personally furnished" by defendants other than the Debtor.

The Debtor disputes Anthem's contentions that it submitted fraudulent claims forms in any way. For example, claims forms submitted under the TIN of a medical director still included the Debtor's name and/or business address for the "service facility location information." Whether the claims forms were fraudulent was a central dispute at trial, with competing experts testifying as to how the forms should be completed. Moreover, the juror misconduct discussed below impacted the jury's consideration of this very issue. However, in all cases, regardless of how the claims were submitted to Anthem, *the Debtor in fact performed the laboratory services for which it sought reimbursement*. There has been no dispute to the contrary.[2]

After Anthem filed its action, the Debtor cross-complained against Anthem for claims related to Anthem's violation of California's Unfair Competition law. In its cross-complaint, the Debtor alleged damages against Anthem in the millions. There were several rounds of demurrers related to the Debtor's cross-complaint. The court sustained Anthem's demurrer to the Debtor's fourth amended cross-complaint. On January 5, 2022, the Debtor and other defendants filed a motion for leave to file a fifth amended cross-complaint. Anthem opposed, and on April 22, 2022, the trial court denied the motion for leave.

Trial was initially set for November 28, 2022. Just two months before trial, the Debtor was essentially abandoned by its original counsel—original counsel filed a motion to be relieved as counsel on September 28, 2022. From the Debtor's perspective, its original counsel appeared to lose interest in the case after the state court denied the Debtor's motion for leave to file a fifth amended cross-complaint, which precluded the Debtor from seeking an affirmative recovery. With only 13 days before trial, the Debtor retained new counsel who filed an *ex parte* application

---

[2] In addition, to the Debtor's knowledge, there was no law or policy prohibiting billing by a medical director. The Debtor's understanding is that while Anthem now has a policy prohibiting what it calls "pass-through billing" for lab services, that policy was not developed until 2021, which was after the time in question.

to continue the trial. On November 16, 2022, the trial court entered an order granting the *ex parte* application and continued the trial to January 2023.

The case proceeded to trial beginning in January 2023, with the trial bifurcated in two phases: a liability and damages phase and a punitive damages phase. Following the first phase, the jury awarded Anthem $7,682,239.86 in damages against the Debtor, Masood, and the other defendants.[3] The jury did not award any punitive damages against any of the defendants after the second phase of trial. Following the jury's verdict, the state court addressed certain equitable issues, filed a statement of decision, and rendered a judgment for restitution under California's Unfair Competition Law, in the identical amount the jury awarded.

### 3.   The Jury's Tainted Verdict and Resulting Appeal

Between the first and second phases of trial, juror misconduct was uncovered. The Debtor and other defendants first moved orally for a mistrial. Later that same day, the jury returned its verdict in the punitive damages trial phase and did not award punitive damages.

The juror misconduct is detailed in the declaration by Juror 11. (*See* Cannova Decl.) According to Juror 11, several jurors had indicated that the Debtor, Masood, and the other defendants should prevail, or that no damages should be awarded. While Juror 11 identifies a number of issues, one instance of misconduct stands apart from the rest. During voir dire, Juror 10 stated that she was "employed in software development[.]" Juror 10 also submitted a form that her employer was Mercury Insurance. However, Juror 10 misstated her true work experience. In reality, Juror 10 not only works for Mercury Insurance, but has worked in the field of insurance claims and claims processing at various employers *for more than 20 years*. Indeed, the LinkedIn Profile for Juror 10 indicates she has worked as bodily injury claims supervisor for years.

Juror 10 concealed her employment history and 20-year experience from the Debtor and all other defendants during the jury voir dire and trial. Further, she used her hidden work experience

---

[3]   While Anthem was awarded $7,682,239.86 in restitution, Anthem did not demonstrate that EqualTox was actually paid this sum. Rather, in many circumstances, Anthem pays the patient for services by an out-of-network provider. *See* https://www.cnn.com/2019/03/01/health/anthem-insurance-payments-patients-eprise/index.html (article titled *Insurer skips doctors and sends massive checks to patients, prompting million-dollar lawsuit*).

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

and apparent expertise in claims in order to "forcefully argue" for a judgment against the Defendants, without considering any evidence the Defendants submitted. (*See* Cannova Decl. at ¶ 18.) Specifically, Juror 10 stated, "'that is not the way we fill out those claims forms' or words to that effect referring to the CMS-1500 form." (*See id.* at ¶ 16.) Juror 10 also "stated that she was familiar with and instructed the jurors how to fill out CMS-1500 forms in what she claimed was the proper manner." (*See id.* at ¶ 17.) Ultimately Juror 11 testified that "[a]fter being dismissed by the Court, it was clear I should not have voted against DEFENDANTS without proper review of all the evidence or because of the pressure to go home by so many of the other jurors" and that "[b]ecause we were not able to get 9 votes in DEFENDANTS favor the jury compromise and voted as a group against them so we could end deliberations and go home." (*See id*. at ¶ 31.)

After releasing the jury following its phase two verdict, the trial court briefly questioned Juror 10 regarding the nature of her current employment. The trial court did not place Juror 10 under oath, did not ask Juror 10 any questions about her 20-year career in insurance claims handling, and did not allow attorneys for either side to ask Juror 10 any questions. Following this limited questioning, the trial court denied the defendants' oral motion for a mistrial.

The Debtor later moved for a new trial on the basis of the jury's misconduct, submitting briefing and evidence, including the declaration from Juror 11, in support. Notably, Anthem did not offer a single word of contrary evidence—no declarations from either Juror 10 or any other juror. While Anthem quibbled about the meaning of some of Juror 11's statements, it did not question his credibility. Nonetheless, the state court denied the Debtor's motion for a new trial. On July 24, 2023, the state court entered an order staying the collection of the judgment for the maximum time under California Code of Civil Procedure § 918. That stay expired on October 21, 2023.

After the denial of their new trial motion, all of the defendants, including the Debtor, have appealed to the California Court of Appeal. The Debtor and Masood will be represented on appeal by the appellate law firm Greines, Martin, Stein, & Richland LLP. The others will be represented by Alex Portales. In addition to challenges to the judgment itself, there are, at least, two

substantial issues on appeal: (1) Did the trial court err in denying the Debtor's new trial motion?; and (2) Did the trial court err in sustaining Anthem's demurrer to the Debtor's cross-complaint? Success on appeal would eliminate Anthem's judgment and would allow the Debtor to pursue Anthem for the millions it is owed. The appeal is currently pending.

### C. Anthem Rejected Mediation and Settlement Efforts

Efforts by Masood and the Debtor to explore a settlement with Anthem were rejected. On October 13, 2023, the Debtor and Masood, through counsel, suggested that the parties attend mediation. On October 18, 2023, counsel for Masood reiterated the intent of the Debtor and Masood to participate in a good faith mediation and he requested a stay of collection efforts while Anthem considered whether or not to mediate and pending any mediation. On October 23, 2023, counsel for Masood followed up with Anthem's counsel to again inquire whether Anthem would agree to negotiate or mediate and to a temporary stay of collection efforts. Only then, after the stay ordered by the state court expired and approximately 10 days after Masood's counsel suggested mediation, did counsel for Anthem respond, stating that Anthem was unwilling to mediate and it intended to proceed with its collection efforts. Anthem's counsel stated that Anthem would reconsider is position on mediation only if mediation was preceded by an offer in an amount that was virtually the entirety of Anthem's judgment.

While Masood's counsel awaited a response from Anthem to his mediation request, Anthem's collection efforts were already well underway. During a few day gap after the judgment was entered and before the state court issued a stay of collection (but while the Debtor's motion for stay was pending), Anthem recorded a notice of judgment lien. Moreover, a mere three days after Masood's counsel was informed that Anthem would not attend mediation, the bank account of Kohzad was levied. The Debtor and Masood learned, on October 30, 2023, that their respective accounts were levied. It appears that the levies were pursuant to a writ of execution issued by the clerk during the stay of collection ordered by the state court.

Anthem's collection efforts have now caused three bankruptcy cases. Masood filed a bankruptcy petition on October 24, 2024, commencing bankruptcy case 8:23-bk-12198-SC. The

Debtor filed its bankruptcy case on October 27, 2023, commencing the instant case. On that same date, Kohzad filed a bankruptcy petition, commencing case no. 8:23-bk-12249-SC.

### D. The Debtor's Chapter 11 Strategy

The Debtor's case strategy is simple and straightforward. The Debtor filed this case to preserve its operations and value as a going concern for all stakeholders. Anthem rejected mediation and made clear its intention to collect on the judgment. The Debtor needs bankruptcy protection to continue to operate, reorganize its debts, and prevent its financial ruin. Absent bankruptcy, Anthem would have levied on the Debtor's bank accounts, crippling its operations to the detriment of all creditors. The Debtor's business is worth preserving. It provides essential and beneficial services throughout Southern California and, absent the financial distress caused by Anthem, generates positive cash flow. The Debtor intends to pursue its pending appeal of Anthem's judgment and to propose a plan providing for a recovery for creditors holding allowed claims over time from operations. The treatment of Anthem's asserted claim will depend on the outcome of the appeal.

## III.   REQUESTED RELIEF

By this Motion, pursuant to §§ 105(a) and 366 of the Bankruptcy Code, the Debtor seeks entry of an emergency order by the Court: (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurances of future payment.

To provide adequate assurance of payment for future services from the Utility Providers, the Debtor proposes to establish reasonable procedures (the "Procedures") by which Utility Providers may request adequate assurance of future payment. The Procedures are as follows:

A.   Absent further order of the Court and except as otherwise provided herein, Utility Providers may not alter, refuse, or discontinue service due to, or discriminate against, the Debtor on account of the commencement of the chapter 11 case or any unpaid pre-petition charges, or

request payment of a deposit or receipt of other security in connection with any unpaid pre-petition charges.

B. The Debtor will serve the order granting the Motion, via first class mail, within five (5) business days after the order is entered by the Court on all Utility Providers identified on Exhibit "1"; provided, however, that for any Utility Provider that may have been omitted from Exhibit "1," the Debtor shall have the right to supplement such list of Utility Providers and shall promptly provide notice of the order to such Utility Provider upon learning of such Utility Provider;

C. A Utility Provider may request assurance of payment within thirty (30) days after the October 27, 2023 petition date (an "Assurance Request") by submitting an Assurance Request to Robert S. Marticello of Smiley Wang-Ekvall, LLP, 3200 Park Center Drive, Suite 250, Costa Mesa, California 92626;

D. Any Assurance Request must (i) be made in writing and (ii) include a summary of the payment history relevant to the affected account(s);

E. If a Utility Provider makes a timely Assurance Request that the Debtor believes is reasonable and does not exceed the average 30-day usage of the Utility Service, the Debtor shall be authorized in its sole discretion to comply with such request and pay a cash deposit to the subject Utility Provider in an amount no more than the average 30-day usage of the Utility Service without further order of the Court;

F. If the Debtor believes that the Assurance Request is unreasonable or the amount requested is in excess of the amount of the Debtor's average 30-day usage, the Debtor will schedule a hearing to determine if assurance to such Utility Provider is necessary (the "Determination Hearing");

G. Pending resolution of that issue at any such Determination Hearing, any Utility Provider making an Assurance Request shall be prohibited from altering, refusing, or discontinuing service to the Debtor; and

H. A Utility Provider shall be deemed to have adequate assurance of payment unless and until a future order of the Court is entered requiring further adequate assurance of payment.

Although the Debtor believes that the list of Utility Providers attached hereto as Exhibit "1" is a complete list, the Debtor reserves its rights, without further order of the Court, to supplement the list to add any Utility Provider that has been inadvertently omitted. If the Debtor supplements the list subsequent to the filing of this Motion, the Debtor will promptly serve a copy of the signed Order on any Utility Provider that is added to the list by such supplement. Concurrently with such service, the Debtor will file with the Court a supplement to Exhibit "1" adding the name of the Utility Provider so served. Such added Utility Provider shall have thirty (30) days from the date of service of the Order to make an Assurance Request. If such an Assurance Request is made, the Debtor shall abide by the procedures set forth above, as applicable. Pending resolution of any Determination Hearing relating to an Assurance Request, the Debtor may seek a further order of the Court prohibiting any Utility Provider from altering, refusing, or discontinuing service to the Debtor.

## IV. BASIS FOR RELIEF UNDER SECTION 366 OF THE BANKRUPTCY CODE

Section 366(a) of the Bankruptcy Code protects a debtor against the immediate termination of utility services after it files for bankruptcy. *See* 11 U.S.C. § 366(a). Pursuant to § 366(a) & (b), a utility provider may not alter, refuse, or discontinue services to a debtor in a chapter 11 case solely due to the commencement of the case or because of unpaid pre-petition amounts. *See* 11 U.S.C. §§ 366(a) & (b). However, the utility provider may subsequently do so unless the debtor (as the Debtor is doing pursuant to this Motion) furnishes "adequate assurance" of payment, in the form of a deposit or otherwise, for post-petition services in a form "satisfactory" to the utility provider within 20 days of the petition date. *See* 11 U.S.C. § 366(b).

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, courts, commentators, and legislative history all confirmed that § 366 does not require, in every case, that the debtor provide a deposit or other security to its utilities as adequate assurance

of payment. In *Virginia Electric & Power Co. v. Caldor, Inc.*, the Second Circuit affirmed the bankruptcy court's ruling that the debtor's pre-petition payment history, its post-petition liquidity, and the administrative priority status afforded to post-petition invoices constituted adequate assurance of future performance. *See Virginia Electric & Power Co. v. Caldor, Inc.*, 117 F.3d 646, 648-49 (2d Cir. 1997); *see also In re Pacific Gas & Elec. Co.*, 271 B.R. 626, 644-45 (N.D. Cal. 2002) (upholding the bankruptcy court's finding that the debtor's likelihood of performance and availability of resources provided adequate assurance); *Shirley v. Philadelphia Elec. Co. (In re Shirley)*, 25 B.R. 247, 249 (Bankr. E.D. Pa. 1982) ("section 366(b) . . . does not permit a utility to request adequate assurance of payment for continued services unless there has been a default by the debtor on a pre-petition debt owed for services rendered").

Under § 366(c) of the Bankruptcy Code, however, in a chapter 11 case, a utility provider may alter, refuse, or discontinue utility service if within 20 days after the commencement of the chapter 11 case, the utility provider does not receive adequate assurance in a form that is "satisfactory" to the utility provider, subject to the Court's ability to modify the amount of adequate assurance. Further, under § 366(c), in making a determination of whether an assurance of payment is adequate, the Court may not consider (i) the absence of security before the petition date, (ii) the debtor's history of timely payment, or (iii) the availability of an administrative expense priority to the utility company.

While the form of adequate assurance of payment may be limited under § 366(c) to the types of security enumerated in § 366(c)(1)(A), the amount of the deposit or other form of security remains fully within the reasonable discretion of the Court. It has been well-established that the requirement that a utility provider receive adequate assurance of payment does not require a guarantee of payment. Instead, the protection granted to a utility provider is intended to avoid exposing the utility provider to an unreasonable risk of nonpayment. In *Adelphia Business Solutions, Inc.*, 280 B.R. 63, 80 (Bankr. S.D.N.Y. 2002), the bankruptcy court stated that "[i]n determining adequate assurance, a bankruptcy court is not required to give a utility company the equivalent of a guaranty of payment, but must only determine that the utility is not subject to an

1 unreasonable risk of nonpayment for post-petition services."  The essence of the Court's inquiry is

2 an examination of the totality of the circumstances in making an informed judgment as to whether

3 utilities will be subject to an unreasonable risk of nonpayment.  *See id.* at 82-83; *see also In re*

4 *Magnesium Corp. of America*, 278 B.R. 698, 714 (Bankr. S.D.N.Y. 2002) ("In deciding what

5 constitutes adequate assurance in a given case, a bankruptcy court must focus upon the need of the

6 utility for assurance, and to require that the debtor supply no more *than that*, since the debtor

7 almost perforce has a conflicting need to conserve scarce financial resources." (emphasis in

8 original) (internal quotations omitted)).

9     Here, the Debtor proposes to protect the Utility Providers by establishing the Procedures

10 provided for herein, whereby any Utility Provider can request adequate assurance in the event that

11 it believes there are facts and circumstances with respect to it providing post-petition services to

12 the Debtor that would merit greater protection.  As set forth above, the Debtor cannot continue to

13 operate in the ordinary course without continued utility services.  The Debtor operates a clinical

14 laboratory that performs laboratory tests for medical diagnosis and treatment, as well as toxicology

15 and other similar tests, such as COVID-19 tests.  If any of the Utility Providers alter, refuse or

16 discontinue service, even for a brief period, the Debtor's business operations would be severely

17 disrupted and potentially irreparably harmed.  Such disruption could have a devastating impact on

18 the Debtor's going concern value and ability to reorganize.  In contrast, the Utility Providers will

19 not be prejudiced by the continuation of their services and will be paid all post-petition utility

20 charges.  It is therefore critical that utility services continue uninterrupted.

21     This Court also has the authority to grant the relief requested herein pursuant to § 105(a) of

22 the Bankruptcy Code, which provides that the Court "may issue any order, process or judgment

23 that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The

24 purpose of § 105(a) is "to assure the bankruptcy court[']s power to take whatever action is

25 appropriate or necessary in aid of the exercise of their jurisdiction."  *See* 2 Collier On Bankruptcy

26 ¶ 105.01, at 105-5 to 105-6 (15th rev. ed. 2001).  Because the proposed Procedures protect the

27

28

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

Debtor and the Utility Providers, they carry out § 366 in a manner fully consistent therewith and are an appropriate exercise of this Court's authority under § 105(a) of the Bankruptcy Code.

## V.    CONCLUSION

Based on the foregoing, the Debtor respectfully request that the Court enter an order:

1. Prohibiting the Utility Providers from altering, refusing, or discontinuing service;
2. Deeming the Utility Providers adequately assured of future performance;
3. Approving the Procedures in their entirety; and
4. Granting such other and further relief as is just and proper under the circumstances of these cases.

DATED:  October 30, 2023              SMILEY WANG-EKVALL, LLP

By:     */s/ Robert S. Marticello*
ROBERT S. MARTICELLO
MICHAEL L. SIMON
Attorneys for Equaltox, LLC

# EXHIBIT "1"

**SCHEDULE OF THE DEBTOR'S UTILITY PROVIDERS**

| Utility Provider | Service | Average Estimated Monthly Payment | Address | Deposit Currently on Hand |
|---|---|---|---|---|
| So Cal Industries | Portable Restrooms | $292.00 | 163 S. 6th Avenue City of Industry, CA 91746 | $0.00 |
| So Cal Edison | Electricity | $3,544.00 | 2244 Walnut Grove Ave Rosemead, CA 91770 | $0.00 |
| GE Mobile Water | Water | $85.00 | 11689 Pacific Ave Fontana, CA 92337 | $0.00 |
| Waste Management | Trash | $8.00 | 13793 Redwood Avenue Chino, CA 91710 | $0.00 |
| Stericycle | Medical Waste Management | $85.00 | 2355 Waukegan Rd Bannockburn, IL 60015 | $0.00 |
| Veolia WTS Services | Water Treatment | $107.00 | 4545 Patent Road Norfolk, VA 23502 | $0.00 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **Debtor's Emergency Motion for Order (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance; and (C) Establishing Procedures for Determining Adequate Assurance of Payment Under 11 U.S.C. Section 366; and Memorandum of Points and Authorities** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **10/30/2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Michael J Hauser    michael.hauser@usdoj.gov
- Robert S Marticello    Rmarticello@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*), I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **10/30/2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
Via Overnight Mail
Honorable Scott C. Clarkson
U.S. Bankruptcy Court, Ronald Reagan Federal Building
411 West Fourth Street
Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/30/2023 | Lynnette Garrett | /s/ *Lynnette Garrett* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    **F 9013-3.1.PROOF.SERVICE**