ELKINS KALT WEINTRAUB REUBEN GARTSIDE, LLP
Michael I. Gottfried, State Bar No. 146689
*mgottfried@elkinskalt.com*
Roye Zur, State Bar No. 273875
*rzur@elkinskalt.com*
Lauren N. Gans, State Bar No. 247542
*lgans@elkinskalt.com*
10345 W. Olympic Boulevard
Los Angeles, CA 90064
Telephone:    310 746-4400
Facsimile:    310 746-4499

Attorneys for Sulaiman Masood and Ahmad
Ali Kohzad, Debtors and Debtors-in-
Possession

RAINES FELDMAN LITTRELL, LLP
Robert S. Marticello, State Bar No. 244256
*rmarticello@raineslaw.com*
Michael L. Simon, State Bar No. 300822
*msimon@raineslaw.com*
Timothy W. Evanston, State Bar No. 319342
*tevanston@raineslaw.com*
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:    310 440-4100
Facsimile:    949 247-3998

Attorneys for Equaltox, LLC, Debtor and
Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA — SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>EQUALTOX, LLC, a California limited liability company,<br><br>        Debtor and Debtor-In-Possession. | Lead Case No. 8:23-bk-12243-SC<br><br>Chapter 11<br><br>(Jointly administered with Case Nos. 8:23-bk-12198-SC and 8:23-bk-12249-SC) |
| In re:<br><br>SULAIMAN MASOOD,<br><br>        Debtor and Debtor-In-Possession. | **DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>[Index of Exhibits filed concurrently herewith]<br><br>**Hearing Information:**<br>Date:        April 11, 2024<br>Time:        11:00 a.m.<br>Place:        Courtroom 5C |

411 West Fourth Street
Santa Ana, CA 92701

In re:

AHMAD ALI KOHZAD,

     Debtor and Debtor-In-Possession.

☐ Affects EQUALTOX, LLC
☐ Affects SULAIMAN MASOOD
☐ Affects AHMAD ALI KOHZAD
☒ Affects all Debtors

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ....................................................................................1

   A.   The Purpose of This Document .........................................................3

   B.   Deadlines for Voting and Objecting; Date of Plan Confirmation
Hearing .............................................................................................4

      1.   Time and Place of the Confirmation Hearing .......................4

      2.   Deadline for Voting For or Against the Plan ........................4

      3.   Deadline for Objecting to Confirmation of the Plan ..............4

      4.   Identity of Person to Contact for More Information
Regarding the Plan ..................................................................5

      5.   Disclaimer ................................................................................5

II.  BACKGROUND ......................................................................................6

   A.   Background Regarding the Debtors and Their Operations ...............6

   B.   Events Leading to the Filing of the Bankruptcy Cases ....................7

      1.   Anthem's Lawsuit Against Equaltox, Masood, Kohzad,
and Others ................................................................................8

      2.   The Jury's Tainted Verdict and Resulting Appeal ...............10

      3.   Anthem's Rejection of Mediation and Settlement Efforts ....11

   C.   Summary of the Debtors' Assets and Liabilities ............................12

      1.   Equaltox ................................................................................12

      2.   Masood ..................................................................................14

      3.   Kohzad ..................................................................................15

   D.   Significant Events During the Bankruptcy Cases ..........................15

      1.   Bankruptcy Proceedings .......................................................15

         a.   "First Day" Motions in Equaltox's Bankruptcy
Case ...........................................................................15

         b.   Employment of Professionals ....................................16

         c.   Claims Bar Date ........................................................16

         d.   Motion for Turnover of Kohzad's Funds Frozen
by JPMorgan Chase ...................................................16

         e.   Motion to Reject Stella Circle Lease .........................17

         f.   Debtors' Schedules and Monthly Operating
Reports ......................................................................17

         g.   Sale of Equipment by Equaltox ................................18

      2.   Other Proceedings .................................................................18

         a.   Non-Dischargeability Complaints Filed by
Anthem Against the Individual Debtors ...................18

i

|  |  |  | b. | The Anthem Appeal | 18 |
|  |  |  | c. | Potential Avoidance Actions | 19 |
|  | E. | Historical and Current Financial | | | 19 |
|  | F. | Steps Taken to Resolve Financial Problems | | | 20 |
| III. | | PLAN SUMMARY | | | 21 |
|  | A. | The Plan Provides for a Reorganization of the Debtors and Their Affairs | | | 21 |
|  | B. | The Plan Treats Claim Against All Three Estates | | | 21 |
|  | C. | What Creditors and Interest Holders Will Receive Under the Proposed Plan | | | 22 |
|  | D. | Allowance and Treatment of Unclassified Claims | | | 22 |
|  |  | 1. | Administrative Claims | | 22 |
|  |  |  | a. | Ordinary Course Administrative Claims | 24 |
|  |  |  | b. | Non-Ordinary Course Administrative Claims | 24 |
|  |  |  | c. | Professional Fee Claims | 25 |
|  |  | 2. | Priority Tax Claims | | 25 |
|  | E. | Allowance and Treatment of Classified Claims and Interests | | | 28 |
|  |  | 1. | Summary of Classes | | 28 |
|  |  | 2. | Secured Claims | | 29 |
|  |  |  | a. | Equaltox Secured Claims | 30 |
|  |  |  | b. | Masood Secured Claims | 39 |
|  |  |  | c. | Kohzad Secured Claims | 42 |
|  |  | 3. | Classes of Priority Unsecured Claims | | 46 |
|  |  | 4. | Classes of General Unsecured Claims | | 48 |
|  |  |  | a. | Equaltox Unsecured Claims | 48 |
|  |  |  | b. | Masood Unsecured Claims | 50 |
|  |  |  | c. | Kohzad Unsecured Claims | 52 |
|  |  |  | d. | General Unsecured Claim of Anthem | 53 |
|  |  | 5. | Class of Interest Holders | | 55 |
|  | F. | Means For Implementation of the Plan | | | 56 |
|  |  | 1. | Funding of the Plan | | 56 |
|  |  | 2. | Sale of Real Properties | | 57 |
|  |  | 3. | The Dissolution or Liquidation of SAM Reinsurance | | 58 |
|  |  | 4. | Settlement and Release of Alleged Estate Claims Against Insiders | | 58 |
|  |  | 5. | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | | 60 |
|  |  | 6. | Post-Confirmation Management | | 60 |

ii

| | | 7. | Powers and Duties of the Reorganized Debtors | 60 |
| | | 8. | Disbursing Agent; Employment of Professionals | 61 |
| | G. | Release of Liens | | 62 |
| | H. | Procedures For Resolving Disputed Claims | | 62 |
| | | 1. | Standing | 62 |
| | | 2. | No Distribution Pending Allowance | 63 |
| | | 3. | Reserves for Disputed Claims | 63 |
| | I. | Distributions | | 63 |
| | | 1. | Distributions for Claims Allowed as of the Effective Date | 63 |
| | | 2. | Distributions on Account of Claims Allowed After the Effective Date | 64 |
| | | | a. Payments and Distributions on Disputed Claims | 64 |
| | | | b. Special Rules for Distributions to Holders of Disputed Claims | 64 |
| | | 3. | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 64 |
| | | | a. Delivery of Distributions in General | 64 |
| | | | b. Undeliverable Distributions | 64 |
| | | | c. Distributions of Unclaimed Property | 65 |
| | | 4. | Compliance with Tax Requirements/Allocations | 65 |
| | J. | Treatment of Executory Contracts and Unexpired Leases | | 66 |
| | | 1. | Assumption of Executory Contracts and Unexpired Leases | 66 |
| | | 2. | Rejection of Executory Contracts or Unexpired Leases Not Assumed | 68 |
| | K. | Preservation of Causes of Action and Avoidance Actions | | 69 |
| | L. | Retention of Jurisdiction | | 70 |
| IV. | | CONFIRMATION REQUIREMENTS AND PROCEDURES | | 72 |
| | A. | Who May Vote on or Object to the Plan | | 72 |
| | B. | Who May Vote to Accept or Reject the Plan | | 72 |
| | C. | What Is an Allowed Claim or Interest | | 72 |
| | D. | What Is an Impaired Claim or Interest | | 73 |
| | E. | Who Is Not Entitled to Vote | | 73 |
| | F. | Who Can Vote in More Than One Class | | 74 |
| | G. | Votes Necessary to Confirm the Plan | | 74 |
| | H. | Votes Necessary for a Class to Accept the Plan | | 74 |
| | I. | Treatment of Non-Accepting Classes ("Cramdown") | | 74 |
| | J. | Liquidation Analysis | | 75 |

iii

|  |  |  |  |  |
|---|---|---|---|---|
| | **K.** | | Feasibility | 79 |
| | | **1.** | Effective Date Payments | 79 |
| | | **2.** | Post-Effective Date Payments | 80 |
| **V.** | | | EFFECT OF CONFIRMATION OF THE PLAN | 82 |
| | | **1.** | Binding Nature of Plan | 82 |
| | | **2.** | Discharge | 82 |
| | | **3.** | Injunction | 83 |
| | | **4.** | Vesting of Property in the Reorganized Debtors | 84 |
| | | **5.** | Modification of the Plan | 84 |
| | | **6.** | Exculpations and Releases | 84 |
| | | **7.** | Submission of Post-Confirmation Reports | 85 |
| | | **8.** | Quarterly Fees | 85 |
| | | **9.** | Post-Confirmation Conversion/Dismissal | 85 |
| | | **10.** | Final Decree | 86 |
| **VI.** | | | RISK FACTORS REGARDING THE PLAN | 86 |
| **VII.** | | | TAX CONSEQUENCES OF THE PLAN | 87 |
| **VIII.** | | | CONCLUSION AND RECOMMENDATION | 87 |
| | | | TABLE OF DEFINITIONS | 89 |
| | **A.** | | Definitions | 89 |
| | **B.** | | Rules of Construction | 100 |
| | **C.** | | Rules of Interpretation | 101 |
| | **D.** | | Disclosure Statement Exhibits | 102 |

Equaltox, LLC ("Equaltox"), Sulaiman Masood ("Masood"), and Ahmad Ali Kohzad ("Kohzad" and, together with Masood, the "Individual Debtors" and, together with Masood and Equaltox, collectively, the "Debtors"), the debtors and debtors-in-possession in the above-captioned jointly-administered cases (the "Cases"), hereby submit this *Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement"), pursuant to § 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances of the Debtors' *Joint Chapter 11 Plan of Reorganization* (the "Plan").  In support of the Disclosure Statement, the Debtors submit the concurrently-filed index of exhibits (the "Index").[1]

## I.   <u>INTRODUCTION</u>

On October 24, 2023, Masood filed a Chapter 11 petition, commencing Case No. 8:23-bk-12198-SC.  On October 27, 2023, Equaltox filed a Chapter 11 petition, commencing Case No. 8:23-bk-12243-SC.  Also on October 27, 2023, Kohzad filed a Chapter 11 petition, commencing Case No. 8:23-bk-12249-SC.  On December 11, 2023, the Bankruptcy Court entered orders of joint administration in each of the Cases.

Chapter 11 allows debtors to propose a plan.  A plan may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtors are the proponents of the Plan that was sent to you in the same envelope as this document.

The Plan is a joint reorganizing plan that provides for the payment of all Allowed Claims[2] in each of the three Cases ***in full*** on the terms set forth herein.  The Reorganized Debtors project that most Allowed General Unsecured Claims, *i.e.*, those incurred in the ordinary course and not subject to dispute, will be paid in full in one lump sum payment within three months after the Effective Date.  Each holder of an Allowed Secured Claim secured by Estate Real Property will be serviced from cash flow and repaid in full by its contractual maturity date.  Distributions on

---

[1]   Unless otherwise provided below, all references to exhibits are to the exhibits attached to the concurrently-filed Index.

[2]   Unless otherwise defined herein, the definition of any capitalized term may be found in the Table of Definitions at the end of the Disclosure Statement.

account of Disputed Claims will be reserved and paid upon the later of allowance or the availability of sufficient cash to pay such Claims.

The payments to Allowed Unsecured Claims will be funded from four sources:

- The Individual Reorganized Debtors will liquidate the account of a non-debtor entity, SAM Reinsurance Company, Inc. ("SAM Reinsurance"), and will contribute the net proceeds therefrom (approximately $1,293,000) towards the payment of Allowed General Unsecured Claims in their respective cases.

- Equaltox will continue to operate its business post-confirmation and, each month, will pay a fixed sum to the Disbursing Agent to be included in the cash available for distribution to the Holders of Allowed Unsecured Claims in its case. This fixed monthly payment will increase over time and will continue until Equaltox's Allowed Unsecured Claims are paid in full.

- If and to the extent necessary to pay Disputed Claims after allowance, the real property in the name of a non-debtor entity, Equaltox Management, Inc. ("Equaltox Management"), will be sold and the resulting net sale proceeds will be used to pay such Claims. The Reorganized Debtors estimate that this property will be worth approximately $3,500,000-$3,700,000 once developed and 100% of the net sale proceeds will be contributed to the Plan.

- Fourth and finally, the Plan settles alleged claims to avoid and recover payments against the Individuals Debtors' family members on fair and equitable terms. The settlement effectuated by the Plan is discussed in more detail in Section III.F.4. The Reorganized Debtors estimate that the value of the consideration to be paid for the release will total $2,338,800, an amount superior to any recovery that could be achieved in litigation. In exchange for the valuable consideration provided under the Plan, any and all claims against any relatives of the Individual Debtors will be released upon the Effective Date of the Plan.

As discussed in further detail below, while the Plan is a joint plan that treats the Claims in each of the Cases, the Debtors are not requesting substantive consolidation of their Estates. The Debtors project that the payments required under the Plan (assuming all Disputed Claims are Allowed) will be completed within four (4) years after the Effective Date.

The Effective Date of the Plan will be the first Business Day that is fifteen (15) days after

2

the entry of an order confirming the Plan ("Confirmation Order"), provided there has been no order staying the effectiveness of the Confirmation Order.

**A.**     **The Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan and provides certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT**:

(**1**)    **WHO CAN VOTE OR OBJECT TO THE PLAN;**

(**2**)    **WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, the projected payment on your claim if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO THE PROJECTED TREATMENT OF YOUR CLAIM IN LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE;**

(**3**)    **THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES;**

(**4**)    **THE FACTORS THE BANKRUPTCY COURT WILL CONSIDER IN DECIDING WHETHER OR NOT TO CONFIRM THE PLAN;**

(**5**)    **WHAT IS THE EFFECT OF CONFIRMATION; AND**

(**6**)    **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the provisions of the Plan will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to

3

make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.

**B.**      **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS JOINTLY-ADMINISTERED CASE.

**1.**      **Time and Place of the Confirmation Hearing**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on _____, in Courtroom 5C of the Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth Street, Santa Ana, California 92701.

**2.**      **Deadline for Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to do so on a timely basis by filling out the enclosed ballot and returning it in the enclosed envelope to Raines Feldman Littrell LLP, Attn: Michael L. Simon, 3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626, or by email to msimon@raineslaw.com.

Your ballot must be received by _____ or it will not be counted.

**3.**      **Deadline for Objecting to Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon: (1) counsel for the Individual Debtors, Elkins Kalt Weintraub Reuben Gartside LLP, Attn: Roye Zur, 10345 W. Olympic Blvd., Los Angeles, CA 90064, or rzur@elkinskalt.com; and (2) counsel for Equaltox, Raines Feldman Littrell LLP, Attn: Robert S. Marticello, 3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626, or rmarticello@raineslaw.com.

Your objection must be received by those parties listed above by _____ or it will not be considered.  The Debtors will file with the Bankruptcy Court and serve the results of

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

the voting by _____, 2024.

**4.**    **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact (1) counsel for the Individual Debtors, Elkins Kalt Weintraub Reuben Gartside LLP, Attn: Roye Zur, 10345 W. Olympic Blvd., Los Angeles, CA 90064, or rzur@elkinskalt.com; or (2) counsel for Equaltox, Raines Feldman Littrell LLP, Attn: Robert S. Marticello, 3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626, or rmarticello@raineslaw.com.

**5.**    **Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtors' respective books and records which, unless otherwise indicated, are unaudited. The information contained in this Disclosure Statement is provided by the Debtors.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE DEBTORS AND THEIR ADVISORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE CASH FLOWS AVAILABLE FOR DISTRIBUTION TO CREDITORS. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL CASH FLOWS TO BE DIFFERENT FROM THOSE BEING PROJECTED, AND THE DEBTORS AND THEIR RESPECTIVE ADVISORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

## II.      **BACKGROUND**

### A.      **Background Regarding the Debtors and Their Operations**

Equaltox is a state-of-the-art clinical laboratory licensed by the California Department of Public Health, providing the communities it serves with essential services. *See* www.equaltox.com. The Centers for Medicare and Medicaid Services and Commission on Office Laboratory Accreditation have accredited Equaltox to perform laboratory tests for medical diagnosis and treatment, as well as toxicology and other similar tests, such as COVID-19 tests. As a toxicology laboratory, Equaltox provides tests related to the treatment of mental health disorders, alcoholism, and other substance abuse disorders.

Equaltox is a family-owned and family-run business. Masood is the sole manager and owner of Equaltox. Kohzad is Masood's first cousin and is employed by Equaltox as its Chief Pharmacist. Masood and Kohzad were born in Kabul, Afghanistan, and immigrated to the United States as young children. The first in their respective families to attend college, Masood and Kohzad graduated in 2007 from Loma Linda University and in 2009 from Western University of Health Sciences, respectively, each with a PharmD degree. Masood and Kohzad's uncle, Mohammed Lutfi ("Lutfi"), is employed by Equaltox as its head Clinical Laboratory Scientist.

On October 20, 2015, Masood filed Equaltox's Articles of Organization with the California Secretary of State, forming Equaltox as a California limited liability company. Equaltox currently employs approximately 18 persons. This includes other members of Masood's family who work for Equaltox. Equaltox's annual revenue for 2022 was $13,990,089.60 and its revenue through October 27, 2023 (*i.e.*, the Equaltox Petition Date) was $5,458,116.43. Equaltox's revenue for 2022 was higher due in large part to a contract with San Bernardino County to provide it with COVID-19 testing in accordance with the state mandates at that time.

Equaltox receives payment for its services largely from insurers, including Medicare, Medical, Cigna, Aetna, Blue Cross of California d.b.a. Anthem Blue Cross and Anthem Blue Cross Life and Health Insurance Company (collectively, "Anthem") and many others, and from private parties as well. Other than the litigation with Anthem discussed below, Equaltox has not experienced litigation with any other insurer.

6

**B.**     <u>**Events Leading to the Filing of the Bankruptcy Cases**</u>

Equaltox provided medically necessary laboratory services to thousands of individuals insured by Anthem.  Anthem designates certain providers as "in-network," meaning they have contracted with Anthem to provide medical care to its insureds, or "out of network."  Equaltox—like many other providers—is "out of network" and does not have a direct contractual relationship with Anthem.

While Equaltox does not have a contract directly with Anthem, it is Equaltox's normal practice to obtain a written assignment of benefits from each of the insureds for whom it provides services.  Through these assignments, the insureds assign to Equaltox their rights to (1) the payment of claims for services Equaltox renders relating to the insureds, and (2) the enforcement of any rights in any proceeding relating thereto.  Accordingly, Equaltox submitted claims to Anthem relating to the laboratory services it provided as the insureds' assignee.

In or about March 2016, soon after Equaltox invoiced Anthem for the laboratory samples it had processed for its insureds on an out-of-network basis, Anthem placed Equaltox on "prepayment review."  Specifically, Anthem placed Equaltox on prepayment review for laboratory services submitted under Healthcare Common Procedure Coding System (HCPCS) code G0483.  This code relates to a specific service—drug testing, *i.e.*, laboratory samples related to treatment for substance abuse disorders.

As its basis for placing Equaltox on prepayment review, Anthem claimed, among other things, billing irregularities.  According to Anthem, it noticed an incorrect billing code submitted eight times for a single patient.  A third-party billing company that handled Equaltox's billing at the time—not Equaltox—submitted the incorrect billing code.  Despite the mistake, Anthem was not overcharged.  Anthem flagged for review all claims for reimbursement with HCPCA code G0483 by Equaltox submitted under Equaltox's tax identification number ("TIN").  Anthem kept Equaltox on prepayment review for as long as it continued to seek payment for the processing of laboratory samples related to treatment of substance abuse disorders; once Equaltox stopped submitting those samples, Anthem removed Equaltox from prepayment review.

Prepayment review allows Anthem to delay payment indefinitely.  Anthem's prepayment

7

review requests that a provider submit medical records with each claim to support the billing of

the claim.  In theory, Anthem pays the claim after receiving the requested medical records.  In

practice, the payment of claims under prepayment review is the exception, not the norm.  Through

the prepayment review process, Anthem not only demands that healthcare providers furnish

substantial additional information related to each claim, Anthem also repeatedly requests the same

documents and information through its myriad departments.  This byzantine process results in

indefinite delays.  Moreover, by delaying payment of claims, Anthem effectively denies the claims

and avoids payment.  In effect, Anthem's prepayment review process is designed to bolster its own

profits by driving healthcare providers to enter into Anthem's network or risk shuttering

operations.  As alleged by Equaltox in its appeal in the Anthem Action detailed below, Equaltox

asserts that Anthem's practice stifles competition and is a violation of the Unfair Competition Law

(Cal. Bus. And Prof. Code §§ 17200 et seq.).[3]  Equaltox understands that Anthem disputes

Equaltox's allegations.

### 1.    <u>Anthem's Lawsuit Against Equaltox, Masood, Kohzad, and Others</u>

On May 18, 2018, Anthem sued Equaltox, Masood, Kohzad, and others in the Superior

Court of California for the County of Orange, Case No. 30-2018-00993688-CU-FR-CJC (the

"Anthem Action"), alleging fraud, violation of California's Unfair Competition Law, and other

claims.  Specifically, Anthem alleged that Equaltox submitted billings for laboratory services

performed with HCPCS code G0483 through separate entities with a different TIN (alleged "pass-

through entities") to avoid prepayment review.  According to Anthem, the claims submitted were

fraudulent because, among other things, the claim forms (known as CMS-1500 forms) asserted

that the laboratory services at issue were "personally furnished" by defendants other than

Equaltox.  Equaltox disputes Anthem's contentions that it submitted fraudulent claims forms in

any way.  For example, claims forms submitted under the TIN of a medical director still included

Equaltox's name and/or business address for the "service facility location information."  Whether

the claims forms were fraudulent was a central dispute at trial, with competing experts testifying

---

[3]    Even before Anthem placed Equaltox on prepayment review due to a billing code error, Anthem arbitrarily refused to pay for any tests by Equaltox due to "historic fraud" related to claims for substance abuse treatment.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

as to how the forms should be completed.  Moreover, the juror misconduct discussed below impacted the jury's consideration of this very issue.  However, in all cases, regardless of how the claims were submitted to Anthem, Equaltox in fact performed the laboratory services for which it sought reimbursement.  There has been no dispute to the contrary.[4]

After Anthem filed the Anthem Action, the Debtors cross-complained against Anthem for claims related to Anthem's violation of California's Unfair Competition law.  In the cross-complaint, the Debtors alleged damages against Anthem in the millions.  There were several rounds of demurrers related to the cross-complaint.  The Superior Court sustained Anthem's demurrer to the fourth amended cross-complaint.  On January 5, 2022, the Debtors and others filed a motion for leave to file a fifth amended cross-complaint. Anthem opposed, and on April 22, 2022, the Superior Court denied the motion for leave.  The Superior Court's rulings related to the Debtors' cross-complaint are at issue in the Debtors' pending appeal.

Trial initially was set for November 28, 2022.  On September 28, 2022, *i.e.*, only two months before trial, the Debtors were essentially abandoned by their original counsel, which filed a motion to be relieved as counsel.  From the Debtors' perspective, their original counsel appeared to lose interest in the case after the Superior Court denied the Debtors' motion for leave to file a fifth amended cross-complaint, which precluded the Debtors from seeking an affirmative recovery.  With only 13 days before trial, the Debtors retained new counsel, who filed an *ex parte* application to continue the trial.  On November 16, 2022, the Superior Court entered an order granting the *ex parte* application and continuing the trial to January 2023.

The case proceeded to trial beginning in January 2023, with the trial bifurcated in two phases: a liability and damages phase and a punitive damages phase.  Following the first phase, the jury awarded Anthem $7,682,239.86 in damages against the Debtors and the other defendants. The jury did not award any punitive damages against any of the defendants after the second phase of trial.  On February 23, 2023, the Superior Court announced its tentative decision on the third and fourth causes of action.  On May 6, 2023, the Superior Court entered its Statement of

---

[4]    In addition, to the Debtors' knowledge, there was no law or policy prohibiting billing by a medical director. The Debtors' understanding is that while Anthem now has a policy prohibiting what it calls "passthrough billing" for lab services, that policy was not developed until 2021, which was after the time in question.

Decision.  On July 5, 2023, the Superior Court entered judgment against each of the Debtors and certain other non-debtor defendants (the "Judgment").

**2.        The Jury's Tainted Verdict and Resulting Appeal**

Between the first and second phases of trial, juror misconduct was uncovered.  The Debtors and other defendants first moved orally for a mistrial.  Later that same day, the jury returned its verdict in the punitive damages trial phase and did not award punitive damages.

The juror misconduct is detailed in the declaration by Juror 11, which was filed as an exhibit with Equaltox's first-day motions.[5]  According to Juror 11, several jurors had indicated that the Debtors and the other defendants should prevail, or that no damages should be awarded.  While Juror 11 identifies a number of issues, one instance of misconduct stands apart from the rest.  During voir dire, Juror 10 stated that she was "employed in software development[.]"  Juror 10 also submitted a form that her employer was Mercury Insurance.  However, Juror 10 misstated her true work experience.  In reality, Juror 10 not only works for Mercury Insurance, but has worked in the field of insurance claims and claims processing at various employers *for more than 20 years*.  Indeed, the LinkedIn Profile for Juror 10 indicates she has worked as bodily injury claims supervisor for years.

Juror 10 concealed her employment history and 20-year experience from the defendants during the jury voir dire and trial.  Further, she used her hidden work experience and apparent expertise in claims in order to "forcefully argue" for a judgment against the defendants, without considering any evidence the defendants submitted.  (*See* Cannova Decl. at ¶ 18.)  Specifically, Juror 10 stated, "that is not the way we fill out those claims forms' or words to that effect referring to the CMS-1500 form."  (*See* Cannova Decl. ¶ 16.)  Juror 10 also "stated that she was familiar with and instructed the jurors how to fill out CMS-1500 forms in what she claimed was the proper manner."  (*See id*. at ¶ 17.)  Ultimately, Juror 11 testified that "[a]fter being dismissed by the Court, it was clear I should not have voted against DEFENDANTS without proper review of all the evidence or because of the pressure to go home by so many of the other jurors" and that

---

[5]    The Cannova Declaration is attached as Exhibit "3" to the *Debtor's Emergency Motion for Order Authorizing the Use of Cash Collateral*, filed as Docket No. 9.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

"[b]ecause we were not able to get 9 votes in DEFENDANTS favor the jury compromise and voted as a group against them so we could end deliberations and go home." (*See id*. at ¶ 31.)

After releasing the jury following its phase two verdict, the Superior Court briefly questioned Juror 10 regarding the nature of her current employment.  The Superior Court did not place Juror 10 under oath, did not ask Juror 10 any questions about her 20-year career in insurance claims handling, and did not allow attorneys for either side to ask Juror 10 any questions. Following this limited questioning, the Superior Court denied the defendants' oral motion for a mistrial.

The Debtors later moved for a new trial on the basis of the jury's misconduct, submitting briefing and evidence, including the declaration from Juror 11, in support.  Notably, Anthem did not offer a single word of contrary evidence—no declarations from either Juror 10 or any other juror.  While Anthem quibbled about the meaning of some of Juror 11's statements, it did not question his credibility.  Nonetheless, the Superior Court denied Equaltox's motion for a new trial.

On July 24, 2023, the Superior Court entered an order staying the collection of the Judgment for the maximum time under California Code of Civil Procedure § 918.  That stay expired on October 21, 2023.  After the denial of their new trial motion, all of the defendants, including the Debtors, have appealed to the California Court of Appeal.

### 3.    Anthem's Rejection of Mediation and Settlement Efforts

Anthem rejected efforts by the Debtors to explore a pre-bankruptcy settlement.  On October 13, 2023, Equaltox and Masood, through counsel, suggested that the parties attend mediation.  On October 18, 2023, counsel for Masood reiterated the intent of the Debtors to participate in a good faith mediation and requested a stay of collection efforts while Anthem considered whether or not to mediate and pending any mediation.  On October 23, 2023, counsel for Masood followed up with Anthem's counsel to again inquire whether Anthem would agree to negotiate or mediate and to a temporary stay of collection efforts.  Only then, after the stay ordered by the Superior Court expired and approximately 10 days after Masood's counsel suggested mediation, did counsel for Anthem respond, stating that Anthem was unwilling to mediate and that it intended to proceed with its collection efforts.  Anthem's counsel stated that

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

Anthem would reconsider its position on mediation only if mediation was preceded by an offer in an amount that was virtually the entirety of Anthem's Judgment.

While Masood's counsel was awaiting a response from Anthem to his mediation request, Anthem's collection efforts were well underway.  During a few-day gap after the Judgment was entered and before the Superior Court issued a stay of collection (but while the Debtors' motion for stay was pending), Anthem recorded a notice of judgment lien.  Moreover, a mere three days after Masood's counsel was informed that Anthem would not attend mediation, the bank account of Kohzad was levied.  Equaltox and Masood learned, post-petition on October 30, 2023, that their respective accounts were levied.  It appears that the levies were pursuant to writs of execution issued by the clerk during the stay of collection ordered by the Superior Court.

Each Debtor provided Anthem with a copy of its or his bankruptcy petition upon filing through counsel.  However, this did not stop Anthem from continuing with collection efforts.  Post-petition, on November 2, 2023, Anthem recorded abstracts of judgment in Orange County and Los Angeles County in violation of the automatic stay under 11 U.S.C. § 362.

As a result of Anthem's aggressive collection efforts and its unequivocal rejection of the Debtors' settlement overtures, Masood filed his bankruptcy case on October 24, 2024, and Equaltox and Kohzad filed their bankruptcy cases on October 27, 2023.

**C.**     **Summary of the Debtors' Assets and Liabilities**

**1.**     **Equaltox**

Equaltox owns or asserts an ownership interest in three real properties.  Equaltox owns its office located at 550 N. Golden Circle Dr., Santa Ana, California 92705 (the "Golden Circle Property").  The Golden Circle Property was purchased for $3,075,000 in March 2023.  Equaltox acquired the Golden Circle Property with two loans from Sunwest Bank – one secured by a first trust deed in the amount of $1,562,200 and another secured by a second trust deed in the amount of $1,249,760.  In May 2023, the second-in-position loan on the Golden Circle Property was repaid via an SBA 504 loan by California Statewide Certified Development Corporation ("CSCDC").

The title to the property located at 8100 Electric Avenue, Stanton, CA 90680 (the "Electric

Avenue Property"), is held in the name of Masood, but Equaltox contends that it is the beneficial

owner of the property.  The Electric Avenue Property was acquired in 2019 for $1,000,000 and the

property is subject to two liens – a first priority lien securing a loan from First Citizens Bank &

Trust in the amount of $473,727.58 and a second priority lien, a second SBA 504 loan from

CSCDC in the amount of $367,699.77.  Equaltox guaranteed the loans.  Equaltox paid all or a

majority of the down payment for the Electric Avenue Property.  Historically, Equaltox has made

the debt service payments associated with the Electric Avenue Property and has received the rental

income from that property.  Masood claims only a nominal interest in this property.

The Electric Avenue Property is leased by Masood to West Coast Alliance for $20,000 a

month.  That lease (the "Electric Avenue Property Lease") includes an option to purchase in favor

of the tenant (the "Purchase Option").  The Purchase Option provides that, upon satisfactory

performance of the Electric Avenue Property Lease, the tenant shall have the option to purchase

the Electric Avenue Property for $2,200,000 (subject to a credit for a portion of the rent timely

paid) provided that the tenant is not in default of the Electric Avenue Property Lease.

Equaltox claims a beneficial ownership interest in the property located at 25825 Las Vegas

Avenue, Dana Point, CA 92624 (the "Las Vegas Avenue Property").  Title to the Las Vegas

Avenue Property is held in the name of Equaltox Management, a non-debtor entity solely owned

by Masood.  Lutfi also contends that he holds a beneficial interest in Equaltox Management and

50% of the funds used to purchase the Las Vegas Avenue Property.  The Las Vegas Avenue

Property was acquired in February 2021 for approximately $1,120,000.  There are no mortgages

on the Las Vegas Avenue Property.  The Las Vegas Avenue Property is currently vacant land

subject to a lease with Electrify America, LLC ("Electrify America").  Electrify America plans to

develop the property with a commercial office building and fourteen charging stations.  The

Debtors believe that, once developed, the Las Vegas Avenue Property will be worth

approximately $3,500,000 to $3,700,000.

Finally, Equaltox owns certain lab equipment that is not necessary for its operations.

Equaltox has filed a motion to obtain authorization to sell certain of that equipment for $185,000,

subject to overbid, as described in Section II.D.1.(b) below.

Equaltox's primary liabilities consist of the following: (a) outstanding trade debt; (b) the debts secured by the Golden Circle Property and the Electric Avenue Property, respectively, as described above; (b) legal fees owing to its pre-petition counsel; and (c) the Judgment in favor of Anthem in the amount of $7,682,239.86, which is subject to a pending appeal. Should the Debtors fully prevail in their appeal, the Judgment would be overturned, the Debtors would receive a new trial, and the Debtors would assert claims to recover millions from Anthem.

### 2. **Masood**

Masood owns the real property located at 511 S. Greenwich St., Anaheim, CA 92804 (the "Greenwich Property"), membership interests/shares in multiple non-debtor entities, most notably Equaltox and Equaltox Management (which, in turn, owns the Las Vegas Avenue Property), and the aforementioned claims against Anthem for violation of California's Unfair Competition Law. Masood has cash or cash equivalents of approximately $1,102,349.25 (inclusive of amounts in an investment account in the name of Masood's trust) and retirement funds of $79,926.60.

The Individual Debtors and non-debtor Lutfi each own one-third of the stock in SAM Reinsurance. Equaltox and Lutfi contributed funds to pay the premiums of insurance policies issued by Cardinal Point Insurance Company, Inc., benefitting Equaltox and M and L Consulting LLC (a company owned by Lutfi). The insurance policies expired post-petition on November 30, 2023. SAM Reinsurance's only asset is a Non-Purpose Loan Collateral Account ("SAM Account") in its name holding approximately $1,960,000.00 (the "SAM Funds"). This sum constitutes the premiums paid. SAM has no business operations and, because the insurance policies have now expired, SAM has no business purpose. The Individual Debtors are not aware of any creditors of SAM Reinsurance. As provided in the Plan, the Individual Debtors will dissolve SAM Reinsurance to the extent needed and the SAM Funds will be contributed to the Plan. Lutfi's share of such funds are being contributed as part of the settlement set forth in Section III.F.4.

Masood's major liabilities include, in addition to the approximate $7.6 million Judgment held by Anthem, approximately $100,000 in tax claims, approximately $1.16 million in mortgages on the above-referenced properties and a personal guarantee of a $1.28 million real property loan

14

on which Equaltox is the borrower (*i.e.*, the Golden Circle Property), and approximately $90,000 in student loans.

### 3. Kohzad

Kohzad owns the real property located at 1312 Peacock Hill Drive, Santa Ana, California 92705 (the "Peacock Hill Property"), which Kohzad rents on Airbnb (Kohzad effectively breaks even on this property). Kohzad also owns the real property located at 19501 Greenbriar Drive, Tarzana, California 91356, his primary residence located 220 South Mall Way, Anaheim, California 92804 (the "Mall Way Property"), and the aforementioned claims against Anthem for violation of California's Unfair Competition Law. Kohzad has cash or cash equivalents of approximately $306,301.79 (inclusive of amounts in an investment account in the name of Kohzad's trust) and retirement funds of $88,671.58.

Finally, Kohzad owns a one-third interest in SAM Reinsurance, which owns the SAM Account holding the SAM Funds ($1,960,000.00).

Kohzad's major liabilities include, in addition to the approximate $7.6 million Judgment held by Anthem, approximately $2.8 million in mortgages on the above-referenced properties, $150,000 for solar panels in connection with the above-referenced properties, approximately $60,000 in credit card debt, and approximately $100,000 in student loans.

### D. Significant Events During the Bankruptcy Cases

#### 1. Bankruptcy Proceedings

##### a. "First Day" Motions in Equaltox's Bankruptcy Case

On October 30, 2023, Equaltox filed the following "first-day" motions: (1) motion for order authorizing use of cash collateral [Docket No. 9]; (2) motion for order authorizing continued use of pre-existing cash management system [Docket No. 10], and (3) utilities motion [Docket No. 11]. On November 3, 2023, the Bankruptcy Court entered orders granting each of the motions.

On November 7, 2023, Equaltox filed an emergency motion for order authorizing the payment of pre-petition wages and honoring pre-petition paid time off [Docket No. 44]. On November 9, 2023, the Bankruptcy Court entered an order granting that motion.

### b.    Employment of Professionals

On December 15, 2023, the Bankruptcy Court entered separate orders authorizing the employment of Elkins Kalt Weintraub Reuben Gartside LLP as general bankruptcy counsel for Kohzad and Masood.  [Docket Nos. 106 and 107, respectively.]

On December 14, 2023, the Bankruptcy Court entered an order authorizing the employment of Smiley Wang-Ekvall LLP as general bankruptcy counsel for Equaltox.  [Docket No. 104.]  After the attorneys responsible for the representation at Smiley Wang-Ekvall LLP departed that firm, Equaltox filed an application to employ their new firm, Raines Feldman Littrell LLP, as general bankruptcy counsel for Equaltox.  [Docket No. 188.]  The Bankruptcy Court approved that application on February 21, 2024.  [Docket No. 201.]

On December 20, 2023, the Bankruptcy Court entered three separate orders authorizing the employment of the law firm Greines, Martin, Stein & Richland LLP as special appellate counsel pursuant to 11 U.S.C. § 327(e) for each of the Debtors.  [Docket No. 132, 133, 134.]

On December 22, 2023, the Bankruptcy Court entered three separate orders authorizing the employment of Grobstein Teeple LLP as financial advisors for each of the Debtors.  [Docket Nos. 148, 149, 150.]

On January 19, 2024, Equaltox filed an application to employ Lab Zen, LLC as its exclusive sales agent to market and sell certain surplus lab equipment.  [Docket No. 171.]  The Bankruptcy Court approved that application on February 7, 2024.  [Docket No. 191.]

### c.    Claims Bar Date

On December 19, 2023, the Bankruptcy Court entered a scheduling order that established, among other things, a claims bar date of February 20, 2024.  [Docket No. 126.]  On December 19 and 20, 2023, each of the Debtors filed and served notice of the bar date.

### d.    Motion for Turnover of Kohzad's Funds Frozen by JPMorgan Chase

Two days prior to his bankruptcy filing, Kohzad's bank accounts were levied as a result of writs of execution issued in favor of Anthem.  As result of the levies, approximately $53,000 of Kohzad's funds were frozen by JPMorgan Chase Bank, N.A.  Following his bankruptcy filing,

1   Kohzad attempted to obtain a consensual release of the funds but was unsuccessful.  Accordingly,

2   Kohzad filed a *Motion for (1) Turnover of Funds Held By JPMorgan Chase Bank, N.A., and (2)*

3   *an Order Compelling the Los Angeles County Sheriff's Department to Deliver Any Levied Funds*

4   *to the Debtor* [Docket No. 27 Case No. 8:23-bk-12249-SC].  Following a hearing on that motion,

5   the Bankruptcy Court entered an order granting Kohzad's motion.  [Docket No. 127.]  Kohzad

6   subsequently obtained a release of the funds in question.

7   e.        <b><u>Motion to Reject Stella Circle Lease</u></b>

8           Pre-petition, Equaltox leased a residential real property at 1650 Stella Circle, Tustin, CA

9   92782, owned by Mohammed and Lydia Lutfi.  This property was used by Equaltox's upper

10  management when needed to be close to Equaltox's business location.  On January 19, 2024, the

11  Court entered an order granting Equaltox's motion to reject that lease in an effort to reduce its

12  expenses and maximize its cash flow.  (*See* Docket No. 173.)

13  f.        <b><u>Debtors' Schedules and Monthly Operating Reports</u></b>

14          The Debtors believe that they are in compliance with the requirements under 11 U.S.C. §

15  521, Federal Rule of Bankruptcy Procedure ("FRBP") 1006 and 1007, and the applicable

16  Guidelines of the OUST.

17          On November 21, 2023, Masood filed his Schedules.  On January 8, 2024, Masood filed

18  amended Schedules.  Additionally, pursuant to FRBP 2015.3, Masood is required to file reports of

19  financial information on non-debtor entities in which he holds a controlling or substantial interest

20  (the "Rule 2015.3 Report"). On November 30, 2023, Masood filed his first Rule 2015.3 Report.

21          On November 24, 2023, Kohzad filed his Schedules.  On January 8, 2024, Kohzad filed

22  amended Schedules.  Kohzad filed his Rule 2015.3 Report on November 28, 2023.

23          On November 27, 2023, Equaltox filed its Schedules.  On January 5, 2024, Equaltox filed

24  amended Schedules A and B and an amended SOFA.

25          Finally, all of the Debtors have prepared and timely submitted Monthly Operating Reports

26  for each of their estates through December 2023.  The Debtors are current on quarterly fees owed

27  to the OUST.

28

1

### g.    Sale of Equipment by Equaltox

2    Equaltox owns certain surplus lab equipment that is not necessary for its operations.

3  Following its bankruptcy filing, Equaltox received an offer from Wavi Instruments to purchase

4  certain equipment for $185,000.  On January 29, 2024, Equaltox filed a motion to sell that

5  equipment for $185,000, subject to overbid.  [Docket No. 182.]  After paying the broker's

6  commission, Equaltox expects to receive approximately $175,750 in proceeds from the sale,

7  subject to Anthem's asserted lien.

8    ### 2.    Other Proceedings

9    ### a.    Non-Dischargeability Complaints Filed by Anthem Against the

10    ### Individual Debtors

11    On February 2, 2024, Anthem filed identical complaints against each of the Individual

12  Debtors, seeking a determination that the debt created by the Judgment is non-dischargeable

13  pursuant to 11 U.S.C. § 523(a)(2) and (6) (the "Non-Dischargeability Complaints"), commencing

14  adversary proceeding nos. 8:24-ap-1015-SC (Blue Cross of California dba Anthem Blue Cross, et

15  al. v. Kohzad) and 8:24-ap-1016-SC (Blue Cross of California dba Anthem Blue Cross, et al. v.

16  Masood).  The Non-Dischargeability Complaints rely heavily on the alleged findings of fraudulent

17  conduct made by the jury in the pre-petition state court lawsuit by Anthem against the Debtors.

18    ### b.    The Anthem Appeal

19    As discussed above, on May 18, 2018, Anthem commenced the Anthem Action.  On or

20  about September 1, 2023, Equaltox, Masood, Kohzad, and the other defendants (collectively, the

21  "Defendants") filed a notice of appeal of the Judgment, commencing Case No. G063027 before

22  the Court of Appeal of California, Fourth Appellate District, Division Three.  On or about October

23  9, 2023, Anthem filed a notice of cross-appeal and the Defendants filed a second notice of appeal.

24  The Defendants' appeal of the Judgment and Anthem's cross-appeal are collectively referred to

25  herein as the "Appeal."  The Court of Appeal transferred the Appeal to the Fourth Appellate

26  District, Division One, and assigned it Case No. D082886.  The Appeal is currently pending.

27    If the Debtors prevail on the Appeal as sought, the Judgment will be overturned and the

28  Debtors will receive a new trial and the Debtors will have claims against Anthem.  The Debtors

understand that Anthem disputes the Debtors' position and believes the Judgment will be affirmed. However, under the Plan, the outcome of the Appeal will not impact the payment of Allowed Claims of other creditors.

On December 12, 2023, the Debtors filed a stipulation with Anthem to lift the automatic arising from each of the three Cases for the limited purpose of permitting the Appeal to proceed through issuance of remittitur by the California Court of Appeal.  (*See* Docket No. 93.)  The Court entered its order granting the motion to approve the stipulation on January 19, 2024.  (*See* Docket No. 174.)  The Debtors estimate that the Appeal will be resolved by the end of 2025.

### c.    **Potential Avoidance Actions**

Attached to the Index as Exhibits "5," "6," and "7" are the SOFAs of Equaltox, Masood, and Kohzad, respectively, which include all payments made to creditors during the 90-day period prior to the Petition Dates and certain other pre-petition transfers.  The listed transfers include payments of compensation or other transfers to, or for the benefit of, the Individual Debtors and relatives of the Individual Debtors.

Avoidance Actions may exist against some or all of these creditors or other transferees, and, unless released by the Plan (*see* Section III.F.4.), all Avoidance Actions under 11 U.S.C. §§ 544 through 550, including, but not limited to, claims for the recovery of preferential transfers, are hereby reserved against all entities for the benefit of the Estates.  The omission of the identity of a recipient of a potentially avoidable and recoverable transfer or of a particular payment from Exhibits "5," "6," and "7" is unintentional and shall not be deemed a waiver of the right of the estates to recover any distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy Code.  It is possible that a significant majority of the payments are either not avoidable or subject to a valid affirmative defense.

The Plan proposes a settlement of any and all alleged claims, including avoidance claims, against the family members of the Individual Debtors.  (*See* Section III.H.3. in Plan.)

### E.    **Historical and Current Financial**

Equaltox's assets consist of the revenues generated from operations and two real properties, the Golden Circle Property and the Electric Avenue Property.  The Electric Avenue Property is

leased to West Coast Alliance for $20,000 a month and the Golden Circle Property is leased to SageBrush LLC for $12,544 a month.  Post-petition, Equaltox continues to operate its business and generate proceeds.  Attached to the Index as Exhibit "4" is a budget-to-actual comparison from Equaltox's Petition Date through and including January 27, 2024.  As reflected in Exhibit "4," through January 27, 2024, Equaltox generated net cash of $682,217 (versus projected net cash of $141,875 and increased its cash on hand from $367,948.69 to $1,050,165.  As of the filing of this Disclosure Statement, Equaltox's cash on hand is approximately $900,000.

Masood and Kohzad are both employees of Equaltox and receive compensation for services they provide to Equaltox.  Masood is the CEO of Equaltox and Kohzad is its Chief Pharmacist.  Post-petition, Masood and Kohzad are receiving base compensation annual salaries of $125,000 and $260,000, respectively.  Kohzad also owns an investment property located at 1312 Peacock Hill Drive, Santa Ana, CA 92705, which Kohzad rents on Airbnb.

Attached to the Index as Exhibit "2" is Equaltox's post-confirmation projections (the "Equaltox Projections").  Attached to the Index as Exhibit "1" are the Debtors' projection of payments under the Plan (the "Plan Projections").  The Debtors' assets and their values are identified and discussed in the liquidation analysis attached to the Index as Exhibit "3" (the "Liquidation Analysis").  The most recent MORs of Equaltox, Masood, and Kohzad, are attached to the Index as Exhibits "8," "9," and "10," respectively.

**F.    Steps Taken to Resolve Financial Problems**

As discussed above, the Debtors' cases were filed due to Anthem's collection efforts. While the Debtors were awaiting a response to their offer to mediate, Anthem was quickly and aggressively attempting to collect its Judgment, including by levying on accounts of the Debtors. Anthem recorded abstracts of judgment after the Petition Dates.  Absent bankruptcy, Anthem would have levied on Equaltox's operating account, crippling Equaltox's operations to the detriment of all creditors.  The filing of the Debtors' cases halted such collection efforts, preserved Equaltox's operations, the value of Equaltox's business, and the assets of all the Debtors, and permitted the Debtors to pursue the Appeal.

Post-petition, with Anthem's collection activities stayed, Equaltox has operated on a cash

20

flow positive basis and has increased its cash on hand.  Through January 27, 2024, Equaltox

generated net cash flow of $682,217 and increased its cash on hand to $1,050,165.  The Plan

allows Equaltox to continue to operate and the Debtors to pursue the Appeal and provides for the

payment of all Allowed Claims in full.

III.    **PLAN SUMMARY**

The following is a summary of the Plan's material provisions.

A.    **The Plan Provides for a Reorganization of the Debtors and Their Affairs**

As explained above, the Plan is a joint reorganizing plan.  Allowed Claims will be paid

from the liquidation of certain assets after the Effective Date and/or post-petition operations.

Distributions to the Holders of Allowed Claims will be made by the Reorganized Debtors and will

continue until the earlier of payment in full or the date certain specified in the Plan.  The Debtors

expect that all General Unsecured Claims, if and to the extent Allowed, will be paid in full within

4 years of the Effective Date.  No distributions will be made to the Holders of any Disputed

Claims unless and until they become Allowed Claims.  The Plan Projections supporting the Plan

are attached to the Index as Exhibit "1."

B.    **The Plan Treats Claim Against All Three Estates**

The Plan provides treatment for the Claims against each of the Debtors' Estates.  The Plan

does not provide for the substantive consolidation of the Estates.  Rather, the Plan contains

essentially three (3) separate plans of reorganization – one for each of Equaltox, Masood, and

Kohzad.  Many of the procedural provisions and the treatment provided for each Class of Claims

of a similar priority in each Estate is the same or substantially similar.  Creditors asserting the

same Claim against more than one Estate or Debtor will receive only one satisfaction of such

Claim.

Unless otherwise expressly provided in the Plan, no Distributions will be made and no

rights will be retained on account of any Claim or Interest that has not become an Allowed Claim

or Allowed Interest.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

**C.** **What Creditors and Interest Holders Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right of priority. The Plan states whether each Class of Claims or Interests is impaired or unimpaired. The Plan provides the treatment each Class will receive. In no event shall any creditor receive more than the creditor's Allowed Claim.

**D.** **Allowance and Treatment of Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class:

**1.** **Administrative Claims**

Administrative Claims are Claims for costs or expenses of administering the Debtors' Chapter 11 cases which are allowed under § 507(a)(2) of the Bankruptcy Code. The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following chart lists all the Debtors' estimated § 507(a)(2) administrative claims and their treatment under this Plan:

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtors, including Administrative Tax Claims | Varies by day | With respect to each Debtor, unless the Debtor objects to an Ordinary Course Administrative Claim, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of such Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |
| Clerk's Office | $0 | With respect to each Debtor, any outstanding Clerk's Office fees will be paid in full on the Effective Date from the cash of such Debtor. |
| OUST Fees | $0 | With respect to each Debtor, any outstanding OUST Fees will be paid in full on the Effective |

22

|  |  | Date from the cash of such Debtor. |
|---|---|---|
| Administrative Tax Claims | $0 | With respect to each Debtor, unless the Debtor objects to an Administrative Tax Claim, each Administrative Tax Claim shall be allowed and paid in the ordinary course of such Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim. |

| Professional Fee Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed[6]** | **Treatment** |
| Elkins Kalt Weintraub Reuben Gartside LLP, general bankruptcy counsel to the Individual Debtors | $230,000[7] | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtors and the Professional. |
| Smiley Wang-Ekvall, LLP, general bankruptcy counsel to Equaltox | $195,000.00[8] | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtors and the Professional. |
| Raines Feldman Littrell LLP, general bankruptcy counsel to Equaltox | $250,000.00 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtors and the Professional. |
| Grobstein Teeple LLP | $180,000[9] | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtors |

[6]    These amounts are only estimates (including future estimates as of confirmation) and are subject to change.  The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower.

[7]    This amount is prior to applying the firm's retainer.

[8]    This amount is prior to applying the firm's retainer.

[9]    This amount is prior to applying Grobstein Teeple LLP's retainer.

23

| | | and the Professional. |
|---|---|---|
| Greines, Martin, Stein & Richland LLP, special appellate counsel to the Debtors | $0.00[10] | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtors and the Professional. |

The following applies to Administrative Claims asserted against each of the Estates:

### a.    Ordinary Course Administrative Claims

With respect to each Reorganized Debtor, unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in the case of such applicable Reorganized Debtor in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim. However, any request for payment, or motion to allow a Claim as an Ordinary Course Administrative Claim must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the OUST by no later than sixty (60) days after the Effective Date.

### b.    Non-Ordinary Course Administrative Claims

A Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtors on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtors to the extent that it is allowed by the Bankruptcy Court only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both files with the Bankruptcy Court a request for allowance and payment of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel for the Reorganized Debtors and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows the Non-Ordinary Course Administrative Claim.

---

[10]    *See* Docket Nos. 78 and 134.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

Any party-in-interest, including, but not limited to, the Reorganized Debtors, may file an objection to such a request for payment within the time provided by the Bankruptcy Rules or within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course Administrative Claims who do not timely file and serve a request for payment will be forever barred from asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estates, the Debtors, the Reorganized Debtors, or their respective assets.

**c.**   **Professional Fee Claims**

A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the Effective Date (or such further date if extended by Court order), the Person holding the Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of the Bankruptcy Court. The Reorganized Debtors or any other party-in-interest may file an objection to such an application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do not timely file and serve an application for allowance and payment will be forever barred from asserting these Claims against the Estates, the Debtors, the Reorganized Debtors, or their respective assets.

**2.**   **Priority Tax Claims**

Priority Tax Claims include certain unsecured income, sales, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five years from the order for relief, unless the holder agrees to a different treatment.

The following charts list the Debtors' known section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Priority Tax Claims – Equaltox | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| Franchise Tax Board ("FTB") | Claim Amount: $0.00 per Proof of Claim 6-1<br><br>Priority Claim Amount: $0.00 per Proof of Claim 6-1 | Any Allowed Priority Tax Claim of the FTB will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the FTB is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>Equaltox shall have the right to prepay any Allowed Priority Tax Claim of the FTB in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the FTB will receive the treatment afforded to Allowed Claims in Equaltox Class 12. |
| Internal Revenue Service ("IRS") | Claim Amount: $27,505.85 per Proof of Claim 4-1<br><br>Priority Claim Amount: $24,901.49 per Proof of Claim 4-1 | Any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>Equaltox shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Equaltox Class 12. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| | | 511 to provide "present value" of the Allowed Priority Tax Claim. |
| --- | --- | --- |

| Priority Tax Claims – Masood | | |
| --- | --- | --- |
| **Description** | **Estimated Amount Owed** | **Treatment** |
| IRS | Claim Amount: $107,834.11 per Proof of Claim 7-1<br><br>Priority Claim Amount: $7,366.69 per Proof of Claim 7-1 | Any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>Masood shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in his sole and absolute discretion..<br><br>Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Masood Class 8. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

| Priority Tax Claims – Kohzad | | |
| --- | --- | --- |
| **Description** | **Estimated Amount Owed** | **Treatment** |
| IRS | Claim Amount: $103,237.33.11 per Proof of Claim 1-1<br><br>Priority Claim Amount: $2,716.70 per Proof of Claim 1-1 | Any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| | | the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. Kohzad shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in his sole and absolute discretion. Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim (and that is not an Allowed Secured Claim) will receive the treatment afforded to Allowed Claims in Kohzad Class 7. |
|---|---|---|
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief. Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

### E.    Allowance and Treatment of Classified Claims and Interests

#### 1.    Summary of Classes

As required by the Bankruptcy Code, with respect to each Case, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. By Debtor, the charts below list Classes of Claims and Interests pertaining to the Debtors established under the Plan and indicate whether the Class is impaired or unimpaired by the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| Summary of Classes – Equaltox | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of Sunwest |
| 2 | Secured Claim of CSCDC (Golden Circle Property) |
| 3 | Secured Claim of First Citizens |
| 4 | Secured Claim of CSCDC (Electric Avenue Property) |
| 5 | Secured Claim of Tesla |
| 6 | Secured Claim of Toyota |
| 7 | Secured Claim of Toyota |
| 8 | Secured Claim of Anthem |
| 9 | Secured Claim of County of Orange |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| 10 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 11 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 12 | General Unsecured Trade Claims |
| 13 | General Unsecured Claim of UnitedHealthcare Insurance Company |
| 14 | General Unsecured Claim of Alejandro Portales |
| 15 | General Unsecured Claim of Anthem |
| 16 | Interest Holder |

| Summary of Classes – Masood | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of WSFS |
| 2 | Secured Claim of Mercedes |
| 3 | Secured Claim of West Coast Alliance |
| 4 | Secured Claim of Toyota |
| 5 | Secured Claim of County of Orange |
| 6 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 7 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 8 | General Unsecured Claims |
| 9 | General Unsecured Claim of Sunwest |
| 10 | General Unsecured Claim of CSCDC (Golden Circle Property) |
| 11 | General Unsecured Claim of First Citizens |
| 12 | General Unsecured Claim of CSCDC (Electric Avenue Property) |
| 13 | General Unsecured Claim of UnitedHealthcare Insurance Company |
| 14 | General Unsecured Claim of Nelnet |
| 15 | General Unsecured Claim of Anthem |

| Summary of Classes – Kohzad | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of US Bank |
| 2 | Secured Claim of MMLI |
| 3 | Secured Claim of Wells Fargo |
| 4 | Secured Claim of IRS |
| 5 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 6 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 7 | General Unsecured Claims |
| 8 | General Unsecured Claim of Mohela |
| 9 | General Unsecured Claim of the U.S. Small Business Administration |
| 10 | General Unsecured Claim of Sunnova (Peacock Hill Property) |
| 11 | General Unsecured Claim for Sunnova (Mall Way Property) |
| 12 | General Unsecured Claim of Anthem |

## 2.    Secured Claims

Secured Claims are Claims secured by valid liens on property of one or more of the Estates.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

### a.    Equaltox Secured Claims

| | | | | |
|---|---|---|---|---|
| | | **Secured Claims – Equaltox** | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | Sunwest<br><br>• Collateral: Golden Circle Property and the rents therefrom<br><br>• Total Claim Amount: $1,566,209.96 per Proof of Claim 12-1<br><br>• Interest Rate: 5.85%<br><br>• Collateral Value: $3,075,000 per the Schedules | N | Y | Upon the Effective Date, Sunwest shall have an Allowed Secured Claim in the amount of $1,566,209.96 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Sunwest's Allowed Secured Claim is paid in full, Sunwest shall receive a monthly payment of principal and interest in the amount required by the Promissory Note dated March 14, 2023 executed by Equaltox as borrower in favor of Sunwest as lender ("Sunwest Note") for such month.<br><br>**Maturity Date**.  Sunwest's Allowed Secured Claim shall be paid in full by April 1, 2033.  If Sunwest's Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by Sunwest to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to Sunwest for the sole and limited purpose of permitting Sunwest to proceed with its remedies to foreclose on the Golden Circle Property.<br><br>**Cure of Arrearages**.  Any monthly payments of principal or interest at the non-default contract rate under the Sunwest Note, or portions thereof, that have come due under the Sunwest Note and have not been paid by the Effective Date will be paid in three equal monthly installments beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months.  Such installment payments shall be added to the monthly payment required herein for such months.  For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum Sunwest asserts is due based on any alleged default under the Sunwest Note (or other loan agreements) or the acceleration of the Sunwest loan.  Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty.<br><br>**Interest**.  Interest shall accrue on the unpaid balance of Sunwest's Allowed Secured Claim at |

| | | | | Secured Claims – Equaltox | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | 5.85%, the non-default contract rate set forth in the Sunwest Note.<br><br>**Due on Sale**. If and to the extent that the Golden Circle Property is sold by the Reorganized Debtor as permitted herein, then Sunwest's Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow. In connection with any such sale, Sunwest shall provide a payoff statement to escrow consistent with the amount due herein.<br><br>**Lien**. Any valid, perfected, and unavoidable lien of Sunwest shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the Sunwest's Allowed Secured Claim in full as provided herein. Upon full satisfaction of Sunwest's Allowed Secured Claim, Sunwest's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Equaltox Class 1 Claim. |
| 2 | CSCDC<br><br>• Collateral: Golden Circle Property and the rents therefrom<br><br>• Total Claim Amount: $1,263,706.28 per the Proof of Claim 15-1<br><br>• Interest Rate: 4.67075%<br><br>• Collateral Value: $3,075,000 per the Schedules | N | Y | Upon the Effective Date, CSCDC shall have an Allowed Secured Claim in the amount of $1,263,706.28 (the "CSCDC Golden Circle Allowed Secured Claim") and the CSCDC Golden Circle Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**. Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the CSCDC Golden Circle Allowed Secured Claim is paid in full, CSCDC shall receive a monthly payment of principal and interest in the amount required by the U.S. Small Business Administration Note dated March 8, 2023 for SBA Loan # 485939107 (the "CSCDC Golden Circle Note") for such month.<br><br>**Maturity Date**. The CSCDC Golden Circle Allowed Secured Claim shall be paid in full by May 1, 2048. If the CSCDC Golden Circle Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by CSCDC to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to CSCDC for the sole and limited purpose of permitting CSCDC to |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | proceed with its remedies to foreclose on the Golden Circle Property.<br><br>**Cure of Arrearages**.  Any monthly payments of principal or interest at the non-default contract rate under the CSCDC Golden Circle Note, or portions thereof, that have come due under the CSCDC Golden Circle Note and have not been paid by the Effective Date will be paid in three equal monthly installments beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months.  Such installment payments shall be added to the monthly payment required herein for such months.  For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum CSCDC claims due based on any alleged default under the CSCDC Golden Circle Note (or other loan agreements) or the acceleration of the CSCDC Golden Circle loan.  Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty.<br><br>**Interest**.  Interest shall accrue on the unpaid balance of the CSCDC Golden Circle Allowed Secured Claim at 4.67075%, the non-default contract rate set forth in the CSCDC Golden Circle Note.<br><br>**Due on Sale**.  If and to the extent that the Golden Circle Property is sold by the Reorganized Debtor as permitted herein, then the CSCDC Golden Circle Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow.  In connection with any such sale, CSCDC shall provide a payoff statement to escrow consistent with the amount due herein.<br><br>**Lien**.  Any valid, perfected, and unavoidable lien of CSCDC shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the CSCDC's Allowed Secured Claim in full as provided herein.  Upon full satisfaction of the CSCDC Golden Circle Allowed Secured Claim, CSCDC's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Equaltox Class 2 Claim. |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 3 | First Citizens Bank & Trust ("First Citizens")<br><br>• Collateral: Electric Avenue Property and the rents therefrom<br><br>• Total Claim Amount: $473,727.58 per the Schedules<br><br>• Interest Rate: 5.314%<br><br>• Collateral Value: $2,200,000 per the Schedules | N | Y | Upon the Effective Date, First Citizens shall have an Allowed Secured Claim in the amount of $473,727.58 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until First Citizens' Allowed Secured Claim is paid in full, First Citizens shall receive a monthly payment of principal and interest in the amount required by the Promissory Note dated October 21, 2019 executed by Sulaiman Masood as borrower in favor of First Citizens as lender (the "First Citizens Note") for such month.<br><br>**Maturity Date**.  First Citizens' Allowed Secured Claim shall be paid in full by November 1, 2029. If First Citizens' Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by First Citizens to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to First Citizens for the sole and limited purpose of permitting First Citizens to proceed with its remedies to foreclose on the Electric Avenue Property.<br><br>**Cure of Arrearages**.  Any monthly payments of principal or interest at the non-default contract rate under the First Citizens Note, or portions thereof, that have come due under the First Citizens Note and have not been paid by the Effective Date will be paid by three equal monthly installments beginning on the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months. Such installment payment shall be added to the monthly payment required herein for such months. For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum First Citizens claims due based on any alleged default under the First Citizens Note (or other loan agreements) or the acceleration of the First Citizens loan.  Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty.<br><br>**Interest**.  Interest shall accrue on the unpaid balance of First Citizens Allowed Secured Claim |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| | Secured Claims – Equaltox | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | at 5.314%, the non-default contract rate set forth in the First Citizens Note.<br><br>**Due on Sale**.  If and to the extent that the Electric Avenue Property is sold by the Reorganized Debtor as permitted herein, then First Citizens Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow.  In connection with any such sale, First Citizens shall provide a payoff statement to escrow consistent with the amount due herein.<br><br>**Lien**.  Any valid, perfected, and unavoidable lien of First Citizens shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the First Citizens' Allowed Secured Claim in full as provided herein.  Upon full satisfaction of First Citizens' Allowed Secured Claim, First Citizens' lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Equaltox Class 3 Claim. |
| 4 | CSCDC<br><br>• Collateral: Electric Avenue Property and the rents therefrom<br><br>• Total Claim Amount: $368,813.94 per Proof of Claim 16-1<br><br>• Interest Rate: 2.41219%<br><br>• Collateral Value: $2,200,000 per the Schedules | N | Y | Upon the Effective Date, CSCDC shall have an Allowed Secured Claim in the amount of $368,813.94 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until CSCDC's Allowed Secured Claim is paid in full, CSCDC shall receive a monthly payment of principal and interest in the amount required by the U.S. Small Business Administration Note for SBA Loan # 3879127010 dated October 22, 2019 (the "CSCDC Electric Avenue Note") for such month.<br><br>**Maturity Date**.  CSCDC's Allowed Secured Claim shall be paid in full by December 1, 2044.  If CSCDC's Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by CSCDC to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to CSCDC for the sole and limited purpose of permitting CSCDC to proceed with its remedies to foreclose on the Electric Avenue Property. |

34

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **Cure of Arrearages**.  Any monthly payments of principal or interest at the non-default contract rate under the CSCDC Electric Avenue Note, or portions thereof, that have come due under the CSCDC Electric Avenue Note and have not been paid by the Effective Date will be paid by three equal monthly installments beginning on the first Business Day of first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months.  Such installment payments shall be added to the monthly payment required herein for such months.  For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum CSCDC claims due based on any alleged default under the CSCDC Electric Avenue Note (or other loan agreements) or the acceleration of the CSCDC Electric Avenue loan.  Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty.<br><br>**Interest**.  Interest shall accrue on the unpaid balance of CSCDC's Allowed Secured Claim at 2.41219%, the non-default contract rate set forth in the CSCDC Electric Ave. Note.<br><br>**Due on Sale**.  If and to the extent that the Electric Avenue Property is sold by the Reorganized Debtor as permitted herein, then CSCDC's Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow.  In connection with any such sale, CSCDC shall provide a payoff statement to escrow consistent with the amount due herein.<br><br>**Lien**.  Any valid, perfected, and unavoidable lien of CSCDC shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the CSCDC's Allowed Secured Claim in full as provided herein.  Upon full satisfaction of CSCDC's Allowed Secured Claim, CSCDC's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Equaltox Class 4 Claim. |
| 5 | Secured Claim of Tesla Motors Inc. ("Tesla")<br><br>• Collateral:  2022 Tesla Model Y | N | Y | Upon the Effective Date, Tesla shall have an Allowed Secured Claim in the amount of $66,400 (less monthly payments received by Tesla prior to the Effective Date) and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein. |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Total Claim Amount: $66,440.00<br><br>• Interest Rate: 0%<br><br>• Collateral Value: $82,045.31 | | | **Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Telsa's Allowed Secured Claim is paid in full, Tesla shall receive a monthly payment of $1,268.77, the amount set forth in the Retail Installment Sale Contract (inclusive of any interest).  Tesla's Allowed Secured Claim shall not accrue any interest (other than any interest included in the monthly payment).<br><br>**Lien**.  Any valid, perfected, and unavoidable lien of Telsa shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the Tesla's Allowed Secured Claim in full as provided herein.  Upon full satisfaction of Tesla's Allowed Secured Claim, Tesla's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Equaltox Class 5 Claim. |
| 6 | Secured Claim of Toyota Motor Credit Corp. ("Toyota")<br><br>• Collateral:  2021 Toyota Prius<br><br>• Total Claim Amount: $28,015.80<br><br>• Interest Rate: 0%<br><br>• Collateral Value: $31,015.80 | N | Y | Upon the Effective Date, Tesla shall have an Allowed Secured Claim in the amount of **$28,016.80** (less monthly payments received by Toyota prior to the Effective Date) and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Toyota's Allowed Secured Claim is paid in full, Toyota shall receive a monthly payment of $466.93, the amount set forth in the Retail Installment Sale Contract (inclusive of any interest).  Toyota's Allowed Secured Claim shall not accrue any interest (other than any interest included in the monthly payment).<br><br>**Lien**.  Any valid, perfected, and unavoidable lien of Toyota shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the Toyota's Allowed Secured Claim in full as provided herein.  Upon full satisfaction of Toyota's Allowed Secured Claim, Toyota's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien. |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The treatment proposed herein shall be in full satisfaction of any Equaltox Class 6 Claim. |
| 7 | Secured Claim of Toyota<br><br>• Collateral: 2020 Toyota Prius<br><br>• Total Claim Amount: $8,300.19 per Proof of Claim 11-1 filed in Masood's case<br><br>• Interest Rate: 1.9%<br><br>• Collateral Value: $28,070.40 | N | N | Upon the Effective Date, Toyota shall have an Allowed Secured Claim in the amount of $28,070 (less monthly payments received by Toyota prior to the Effective Date) and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**. Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Toyota's Allowed Secured Claim is paid in full, Toyota shall receive a monthly payment of $467.84, the amount set forth in the Retail Installment Sale Contract (inclusive of any interest). Toyota's Allowed Secured Claim shall not accrue any interest (other than any interest included in the monthly payment).<br><br>**Lien**. Any valid, perfected, and unavoidable lien of Toyota shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the Toyota's Allowed Secured Claim in full as provided herein. Upon full satisfaction of Toyota's Allowed Secured Claim, Toyota's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Equaltox Class 7 Claim. |
| 8 | Anthem<br><br>• Collateral: Equipment and Equipment Sale Proceeds<br><br>• Total Claim Amount: $8,002,602.51 per Anthem Proof of Claim 11-1<br><br>• Interest Rate: 4.76%<br><br>• Collateral Value: $220,000 (est.) based on the Schedules and equipment purchase price. | N | Y | Anthem asserts a lien in the Debtor's equipment and the Equipment Sale Proceeds. Any Allowed Secured Claim of Anthem shall be paid in full with interest in accordance with the treatment provided in Class 16 below.<br><br>On the Effective Date, the Equipment Sale Proceeds shall be deposited in the Anthem Reserve Funds (as defined in Class 16 below).<br><br>Payments received by Anthem in accordance with Class 16 below shall be first applied to principal on any Allowed Secured Claim and then to interest on such Allowed Secured Claim.<br><br>Anthem may assert a lien in the Debtor's accounts receivable or the proceeds thereof as of the Petition Date under California law. However, any such lien terminated upon the filing of the Case. *See* Cal. Civ. Proc. § 697.620(c). In addition, the automatic stay prevents the creation |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | of a lien in Equaltox's post-petition accounts receivable and proceeds.  *See* 11 U.S.C. § 362(a)(4) & (5); *see also In re Fuller*, 134 B.R. 945, 947 (B.A.P. 9th Cir. 1992). |
| | | | | Anthem may assert a lien in the Debtor's real properties based on the recordation of the abstracts of judgment attached to Anthem's Proof of Claim 11-1.  However, such abstracts were recorded after the Petition Date in violation of the automatic stay and, as such, are void *ab initio* without further action or order of the Court.  *See In re Schwartz*, 954 F.2d 569, 571-72 (9th Cir. 1992). |
| | | | | Any valid, perfected, and unavoidable lien of Anthem as of the Petition Date shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of any Allowed Secured Claim of Anthem in full as provided herein.  Upon full satisfaction of any Allowed Secured Claim of Anthem, any and all liens held by Anthem shall be released and the Reorganized Debtors shall retain title to the collateral subject to such liens free and clear of such liens. |
| | | | | Upon the Effective Date, Anthem's abstracts of judgment shall be released and expunged.  Upon and after the Effective Date, the Reorganized Debtors shall be empowered to take such action and record such instruments as needed to expunge and release Anthem's abstracts of judgment. |
| | | | | The treatment proposed herein shall be in full satisfaction of any Equaltox Class 8 Claim. |
| 9 | County of Orange<br><br>• Collateral: Golden Circle Property and Las Vegas Avenue Property<br><br>• Total Claim Amount: $51,917.55 per Proof of Claim 9-1 | N | Y | Any Allowed Secured Tax Claim of the County of Orange shall be paid in accordance with the treatment provided for the Allowed Priority Tax Claims against Equaltox, as set forth above, in accordance with 11 U.S.C. § 1129(a)(9)(D).<br><br>Any valid, perfected, and unavoidable lien of the County of Orange shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of any Allowed Secured Tax Claim in full as provided herein.  Upon full satisfaction of any Allowed Secured Tax Claim, the County of Orange's lien(s) shall be released and Equaltox shall retain title to the collateral subject to the lien(s) free and clear of the lien(s).<br><br>Equaltox shall have the right to prepay any Allowed Secured Claim of the County of Orange in full at any time and without penalty or fee, in his sole and absolute discretion. |

| Secured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The treatment proposed herein shall be in full satisfaction of any Equaltox Class 9 Claim. |

### b.  Masood Secured Claims

| Secured Claims – Masood | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | Wilmington Savings Fund Society, FSB, as Trustee of Trestle Titling Trust-1 ("WSFS")<br><br>• Collateral: Greenwich Property<br><br>• Total Claim Amount: $321,499.18 per Proof of Claim 3-1<br><br>• Interest Rate: 2.625%<br><br>• Collateral Value: $1,233,100 | N | Y | Upon the Effective Date, WSFS shall have an Allowed Secured Claim in the amount of $321,499.18 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until WSFS's Allowed Secured Claim is paid in full, WSFS shall receive a monthly payment of principal and interest in the amount required by the Note dated January 27, 2021 and attached to WSFS's Proof of Claim 3-1 (the "WSFS Note") for such month.<br><br>**Maturity Date**. WSFS's Allowed Secured Claim shall be paid in full by February 1, 2051.  If WSFS's Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by WSFS to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to WSFS for the sole and limited purpose of permitting WSFS to proceed with its remedies to foreclose on the Greenwich Property.<br><br>**Cure of Arrearages**.  Any monthly payments of principal or interest at the non-default contract rate under the WSFS Note, or portions thereof, that have come due under the WSFS Note and have not been paid by the Effective Date will be paid by three equal monthly installments beginning on the first Business day of the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months.  Such installment payments shall be added to the monthly payment required herein for such months.  For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum WSFS claims due based on any alleged default under the WSFS Note (or other loan agreements) or the acceleration of the WSFS loan. Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty. |

| | | | | **Secured Claims – Masood** |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **Interest**. Interest shall accrue on the unpaid balance of WSFS's Allowed Secured Claim at 2.625%, the non-default contract rate set forth in the WSFS Note. |
| | | | | **Due on Sale**. If and to the extent that the Greenwich Street Property is sold by the Reorganized Debtor as permitted herein, then WSFS's Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow. In connection with any such sale, WSFS shall provide a payoff statement to escrow consistent with the amount due herein. |
| | | | | **Lien**. Any valid, perfected, and unavoidable lien of WSFS shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the WSFS's Allowed Secured Claim in full as provided herein. Upon full satisfaction of WSFS's Allowed Secured Claim, WSFS's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien. |
| | | | | The treatment proposed herein shall be in full satisfaction of any Masood Class 1 Claim. |
| 2 | Mercedes-Benz Financial Services ("Mercedes")<br><br>• Collateral: 2018 Mercedes Bens S450 V4<br><br>• Total Claim Amount: $34,856.88 Proof of Claim 6-1<br><br>• Interest Rate: 6.89%<br><br>Collateral Value: $39,000 per Proof of Claim 6-1 | N | N | Upon the Effective Date, Mercedes shall have an Allowed Secured Claim in the amount of $34,856.88 (less monthly payments received by Mercedes prior to the Effective Date) and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**. Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Telsa's Allowed Secured Claim is paid in full, Mercedes shall receive a monthly payment of $1,682.02, the amount set forth in the Retail Installment Sale Contract (inclusive of any interest). Mercedes's Allowed Secured Claim shall not accrue any interest (other than any interest included in the monthly payment).<br><br>**Lien**. Any valid, perfected, and unavoidable lien of Toyota shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the Mercedes' Allowed Secured Claim in full as provided herein. Upon full satisfaction of Mercedes' Allowed Secured Claim, Mercedes' lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien. |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| | | | | Secured Claims – Masood |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The treatment proposed herein shall be in full satisfaction of any Masood Class 2 Claim. |
| 3 | West Coast Alliance<br><br>Total Claim Amount: $2,200,000 Proof of Claim 9-1 | N | Y | West Coast Alliance filed Proof of Claim 9-1 asserting a Secured Claim in the amount of $2,200,000 based on the Option.  However, West Coast Alliance was not granted a security interest in any property of the Debtor, including, without limitation, the Electric Avenue Property.  West Coast Alliance does not hold a lien.  Moreover, under the Electric Avenue Property Lease, West Coast Alliance is obligated to pay rent; the Debtor does not owe West Coast Alliance any sum.  West Coast Alliance's asserted Secured Claim is a Disputed Claim and West Coast Alliance will not receive any Distributions under the Plan.  The confirmation of the Plan shall constitute the disallowance of West Coast Alliance's Claim.<br><br>As provided herein, the Electric Avenue Property Lease is being assumed and West Coast Alliance will be permitted to exercise the Purchase Option on the terms and conditions of the Electric Avenue Property Lease.<br><br>The treatment proposed herein shall be in full satisfaction of any Masood Class 3 Claim. |
| 4 | Secured Claim of Toyota<br><br>• Collateral:  2020 Toyota Prius<br><br>• Total Claim Amount: $8,300.19 per Proof of Claim 11-1<br><br>• Interest Rate: 1.9%<br><br>Collateral Value: $28,070.40 | N | Y | Toyota's Claim is being treated and paid as a fully secured claim in the case of Equaltox.  The treatment in Equaltox Class 7 is in full settlement and satisfaction of Toyota's Proof of Claim No. 11-1 in the Masood Case. |
| 5 | County of Orange<br><br>• Collateral: Electric Avenue Property and Greenwich Property<br><br>Total Claim Amount: $20,858.52 per Proof of Claim 9-1 | N | Y | Any Allowed Secured Tax Claim of the County of Orange shall be paid in accordance with the treatment provided for the Allowed Priority Tax Claims against Masood, as set forth above, in accordance with 11 U.S.C. § 1129(a)(9)(D).<br><br>Any valid, perfected, and unavoidable lien of the County of Orange shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of any Allowed Secured Tax Claim in full as provided herein.  Upon full satisfaction of any Allowed Secured Tax Claim, the County of Orange's lien(s) shall be released and Masood shall retain title to the collateral subject to the lien(s) free and clear of the lien(s). |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

| Secured Claims – Masood | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Masood shall have the right to prepay any Allowed Secured Claim of the County of Orange in full at any time and without penalty or fee, in his sole and absolute discretion. |
| | | | | The treatment proposed herein shall be in full satisfaction of any Masood Class 5 Claim. |

### c.    Kohzad Secured Claims

| Secured Claims – Kohzad | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | U.S. Bank Trust National Association, Not in its Individual Capacity, But Solely As Owner Trustee of Bravo Residential Funding Trust 2023-NQM4 ("US Bank")<br><br>• Collateral: 19501 Greenbriar Drive, Tarzana CA 91356 (the "Greenbriar Property")<br><br>• Total Claim Amount: $1,341,261.47 per Proof of Claim 7-1<br><br>• Interest Rate: 7.875%<br><br>• Collateral Value: $1,856,800 | N | Y | Upon the Effective Date, US Bank shall have an Allowed Secured Claim in the amount of $1,341,261.47 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**Payment**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until US Bank's Allowed Secured Claim is paid in full, US Bank shall receive a monthly payment of principal and interest in the amount required by the note dated March 9, 2023 held by US Bank (the "US Bank Note") for such month.<br><br>**Maturity Date**.  US Bank's Allowed Secured Claim shall be paid in full by April 1, 2053.  If US Bank's Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by US Bank to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to US Bank for the sole and limited purpose of permitting US Bank to proceed with its remedies to foreclose on the Greenbriar Property.<br><br>**Cure of Arrearages**.  Any monthly payments of principal or interest at the non-default contract rate under the US Bank Note, or portions thereof, that have come due under the US Bank Note and have not been paid by the Effective Date will be paid by three equal monthly installments beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months.  Such installment payments shall be added to the monthly payment required herein for such months.  For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum US Bank claims due based on any alleged default |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

| | | | | Secured Claims – Kohzad |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | under the US Bank Note (or any other loan agreements) or the acceleration of the US Bank loan. Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty. <br><br> **Interest**. Interest shall accrue on the unpaid balance of US Bank's Allowed Secured Claim at 7.875%, the non-default contract rate set forth in the US Bank Note. <br><br> **Due on Sale**. If and to the extent that the Greenbriar Property is sold by the Reorganized Debtor as permitted herein, then US Bank's Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow. In connection with any such sale, US Bank shall provide a payoff statement to escrow consistent with the amount due herein. <br><br> **Lien**. Any valid, perfected, and unavoidable lien of US Bank shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the US Bank's Allowed Secured Claim in full as provided herein. Upon full satisfaction of US Bank's Allowed Secured Claim, US Bank's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien. <br><br> The treatment proposed herein shall be in full satisfaction of any Kohzad Class 1 Claim. |
| 2 | Massachusetts Mutual Life Insurance Company ("MMLI") <br><br> • Collateral: 1312 Peacock Hill Drive, Santa Ana, CA <br><br> • Toal Claim Amount: $1,139,957.23 per Proof of Claim 9-1 <br><br> • Interest Rate: 6.0% <br><br> • Collateral Value: $2,319,200 | N | Y | Upon the Effective Date, MMIL shall have an Allowed Secured Claim in the amount of $1,139,957.23 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein. <br><br> **Payment**. Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until MMIL's Allowed Secured Claim is paid in full, MMIL shall receive a monthly payment of principal and interest in the amount required by the Fixed/Adjustable Rate Note dated March 22, 2019 held by MMIL (the "MMIL Note") for such month. <br><br> **Maturity Date**. MMIL's Allowed Secured Claim shall be paid in full by the maturity date set forth in the MMIL Note of April 1, 2049. If MMIL's Allowed Secured Claim is not paid in full by such maturity date, then the discharge injunction shall be automatically lifted as to MMIL for the sole and limited purpose of permitting MMIL to proceed |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| | | | | |
|---|---|---|---|---|
| **Secured Claims – Kohzad** | | | | |
| <u>Class</u> | <u>Description</u> | <u>Insiders</u><br>(Y/N) | <u>Impaired</u><br>(Y/N) | <u>Treatment</u> |
| | | | | with its remedies to foreclose on the Peacock Hill Property.<br><br>**<u>Cure of Arrearages</u>**.  Any monthly payments of principal or interest at the non-default contract rate under the MMIL Note, or portions thereof, that have come due under the MMIL Note and have not been paid by the Effective Date will be paid by three equal monthly installments beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months.  Such installment payments shall be added to the monthly payment required herein for such months.  For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum MMIL claims due based on any alleged default under the MMIL Note (or any other loan agreement) or the acceleration of the MMIL loan.  Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty.<br><br>**<u>Interest</u>**.  Interest shall accrue on the unpaid balance of MMIL's Allowed Secured Claim at 6.0%, the non-default contract rate set forth in the MMIL Note.<br><br>**<u>Due on Sale</u>**.  If and to the extent that the Peacock Hill Property is sold by the Reorganized Debtor as permitted herein, then MMIL's Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow.  In connection with any such sale, MMIL shall provide a payoff statement to escrow consistent with the amount due herein.<br><br>**<u>Lien</u>**.  Any valid, perfected, and unavoidable lien of MMIL shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the MMIL's Allowed Secured Claim in full as provided herein.  Upon full satisfaction of MMIL's Allowed Secured Claim, MMIL's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Kohzad Class 2 Claim. |
| 3 | Wells Fargo Bank, N.A. ("Wells Fargo")<br><br>• Collateral: 220S Mall Way, Anaheim, CA 92804 | N | Y | Upon the Effective Date, Wells Fargo shall have an Allowed Secured Claim in the amount of $315,225.82 and such Allowed Secured Claim will be paid in full by monthly payments pursuant to the treatment herein.<br><br>**<u>Payment</u>**.  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Wells Fargo's |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| | | | | Secured Claims – Kohzad |
|---|---|---|---|---|

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | • Total Claim Amount: $315,225.82 per Proof of Claim 8-2 <br><br> • Interest Rate: 3.625% <br><br> • Collateral Value: $1,062,500 per Schedules | | | Allowed Secured Claim is paid in full, Wells Fargo shall receive a monthly payment of principal and interest in the amount required by the Note dated August 9, 2012 attached to Wells Fargo's Proof of Claim 8-2 (the "Wells Fargo Note") for such month. <br><br> **Maturity Date**. Wells Fargo's Allowed Secured Claim shall be paid in full by September 1, 2042. If Wells Fargo's Allowed Secured Claim is not paid in full by such maturity date and such failure to pay is not cured within thirty (30) days of written notice thereof provided by Wells Fargo to the Reorganized Debtor and its counsel, then the discharge injunction shall be automatically lifted as to Wells Fargo for the sole and limited purpose of permitting Wells Fargo to proceed with its remedies to foreclose on the Mall Way Property. <br><br> **Cure of Arrearages**. Any monthly payments of principal or interest at the non-default contract rate under the Wells Fargo Note, or portions thereof, that have come due under the Wells Fargo Note and have not been paid by the Effective Date will be paid by three equal monthly installments beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each of the next two consecutive months. Such installment payments shall be added to the monthly payment required herein for such months. For the avoidance of doubt, the amount to be cured as provided herein shall exclude any sum Wells Fargo claims due based on any alleged default under the Wells Fargo Note (or other loan agreements) or the acceleration of the Wells Fargo loan. Moreover, notwithstanding the foregoing, the Reorganized Debtor shall have the right to prepay the amount to be cured without penalty. <br><br> **Interest**. Interest shall accrue on the unpaid balance of Wells Fargo's Allowed Secured Claim at 3.625%, the non-default contract rate set forth in the Wells Fargo Note. <br><br> **Due on Sale**. If and to the extent that the Mall Way Property is sold by the Reorganized Debtor as permitted herein, then Wells Fargo's Allowed Secured Claim shall be paid in full upon the closing of such sale from escrow. In connection with any such sale, Wells Fargo shall provide a payoff statement to escrow consistent with the amount due herein. <br><br> **Lien**. Any valid, perfected, and unavoidable lien of Wells Fargo shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of the Wells Fargo's Allowed |

45

| Secured Claims – Kohzad | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Secured Claim in full as provided herein.  Upon full satisfaction of Wells Fargo's Allowed Secured Claim, Wells Fargo's lien shall be released and the Reorganized Debtor shall retain title to the collateral subject to the lien free and clear of the lien.<br><br>The treatment proposed herein shall be in full satisfaction of any Kohzad Class 3 Claim. |
| 4 | Secured Claim of IRS<br><br>• Collateral: All of Kohzad's right, title and interest to property under 26 U.S.C. § 6321 per Proof of Claim 1-1<br><br>Secured Claim Amount: $36,855.78 per Proof of Claim 1-1 | N | Y | Any Allowed Secured Tax Claim of the IRS shall be paid in accordance with the treatment provided for the IRS' Allowed Priority Tax Claim against Kohzad, as set forth above, in accordance with 11 U.S.C. § 1129(a)(9)(D).<br><br>Any valid, perfected, and unavoidable lien of the IRS shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of any Allowed Secured Tax Claim in full as provided herein.  Upon full satisfaction of any Allowed Secured Tax Claim, the IRS's lien(s) shall be released and Kohzad shall retain title to the collateral subject to the lien(s) free and clear of the lien(s).<br><br>Kohzad shall have the right to prepay any Allowed Secured Claim of the IRS in full at any time and without penalty or fee, in his sole and absolute discretion.<br><br>The treatment proposed herein shall be in full satisfaction of any Kohzad Class 4 Claim. |

### 3.    Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes.  The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of Priority Unsecured Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

The Debtors are unaware of any Priority Unsecured Claims.  However, in an abundance of caution, the following chart lists all Classes containing the Debtors' section 507(a)(4), (a)(5),

46

1    (a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Classes of Priority Unsecured Claims – Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 10 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5) Estimated total amount of claims: $0.00[11] | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 10 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Equaltox Class 10. |
| 11 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7) Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 11 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Equaltox Class 11. |

| Classes of Priority Unsecured Claims – Masood | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 6 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5) Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 6 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Masood Class 6. |
| 7 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7) Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 7 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Masood Class 7. |
| Classes of Priority Unsecured Claims – Kohzad | | | | |

---

[11]   Equaltox's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

47

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| 5 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 5 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim.<br>Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Kohzad Class 5. |
| 6 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 6 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Kohzad Class 6. |

## 4.    Classes of General Unsecured Claims

### a.    Equaltox Unsecured Claims

| General Unsecured Claims - Equaltox | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 12 | General Unsecured Trade Claims<br><br>Amount: $269,979.87 (estimated) | N | Y | The Holders of Allowed Equaltox Unsecured Trade Claims shall be paid 100% of such Holders' Allowed Equaltox Unsecured Trade Claims from Equaltox Available Cash as follows:<br><br>Each Holder of an Allowed Equaltox Unsecured Trade Claim in this Class will receive a Pro Rata Payment from any Equaltox Available Cash on each Quarterly Distribution Date beginning on the Payment Commencement Date and continuing each calendar quarter thereafter until such Holder's Allowed Equaltox Unsecured Trade Claim is paid in full.<br><br>To the extent that the any Equaltox Unsecured Trade Claim is a Disputed Claim on a Quarterly Distribution Date, any Pro Rata Payment attributable to such Equaltox Unsecured Trade Claim shall be reserved as provided in Section III.H.3 below.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Equaltox Unsecured Trade Claims.<br><br>Based on the Plan Projections and the assumptions used in preparing the Plan Projections, the |

48

| | | General Unsecured Claims - Equaltox | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Reorganized Debtors estimate that the Allowed Equaltox Unsecured Trade Claims in this Class will be paid in full within four (4) months after the Effective Date. This date is an estimate only and the date upon which Allowed Equaltox Unsecured Trade Claims are paid in full in this Class could be earlier or later than the estimated date. |
| 13 | UnitedHealthcare Insurance Company

Amount: $333,939.59 per Proof of Claim No. 10-1 | N | Y | The Claim of UnitedHealthcare Insurance Company is a Disputed Claim.

UnitedHealthcare Insurance Company shall be paid 100% of its Allowed Claim, if any, in quarterly *pro rata* Distributions from Equaltox's Available Cash as follows:

On each Quarterly Distribution Date beginning on the Payment Commencement Date and continuing each calendar quarter thereafter until any Allowed Unsecured Claim of UnitedHealthcare Insurance Company is paid in full, UnitedHealthcare Insurance Company will receive a *pro rata* Distribution together with the Holder of any Allowed Claim in Class 16 from any Equaltox Available Cash remaining after payment of Allowed Equaltox Unsecured Trade Claims in Equaltox Class 12 in full.

Pending the allowance of UnitedHealthcare Insurance Company's asserted General Unsecured Claim by Final Order of the Court, any Distribution otherwise payable to UnitedHealthcare Insurance Company shall be reserved in accordance with Section III.H.3 below. UnitedHealthcare Insurance Company will be paid under the Plan only to the extent that, pursuant to a Final Order of the Court, UnitedHealthcare Insurance Company holds an Allowed Claim. |
| 14 | Alejandro Portales
Amount: $600,000 per Schedules | N | Y | On the Effective Date, Portales shall hold an Allowed General Unsecured Claim in the amount of $600,000, and such Claim shall be paid in full as follows:

Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Portales' Allowed Claim is paid in full, Portales shall receive a payment of $5,000. Portales' Allowed General Unsecured Claim shall not accrue interest.

The treatment proposed herein shall be in full settlement and satisfaction of this Equaltox Class 14 Claim. |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

### b.    Masood Unsecured Claims

| | | | | General Unsecured Claims – Masood |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 8 | General Unsecured Claims<br><br>Amount: $223,169.47 (estimated) | N | Y | The Holders of Allowed Masood General Unsecured Claims shall be paid 100% of such Holders' Allowed Masood General Unsecured Claims in quarterly *pro rata* installments from Masood Available Cash as follows:<br><br>Each Holder of an Allowed Masood General Unsecured Claim in this Class will receive a Pro Rata Payment from any Masood Available Cash on each Quarterly Distribution Date beginning on the Payment Commencement Date and continuing each calendar quarter thereafter until such Holder's Allowed Masood General Unsecured Claim is paid in full.<br><br>To the extent that the any Masood General Unsecured Claim is a Disputed Claim on a Quarterly Distribution Date, any Pro Rata Payment attributable for such Masood Unsecured Claim shall be reserved as provided in Section III.H.3 below.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Masood General Unsecured Claims.<br><br>Based on the Plan Projections and the assumptions used in preparing the Plan Projections, the Reorganized Debtors estimate that the Allowed General Unsecured Claims in this Class will be paid in full within four (4) months after the Effective Date by Masood Reorganized Debtor's receipt of the Masood SAM Funds.  This date is an estimate only and the date upon which Allowed Masood General Unsecured Claims are paid in full in this Class could be earlier or later than the estimated date. |
| 9 | Sunwest's General Unsecured Claim<br><br>Total Claim Amount: $1,566,209.96 per Proof of Claim 13-1 | N | Y | Sunwest's Claim is being treated and paid as a fully secured claim in the case of Equaltox. Sunwest will receive the treatment in Equaltox Class 1 in full settlement and satisfaction of its Proof of Claim 13-1 in the Masood Case. Sunwest shall not receive any Distribution in the Masood Case. |
| 10 | CSCDC's General Unsecured Claim (Golden Circle Property)<br><br>Total Claim Amount: $1,249,760 per Proof | N | Y | CSCDC's Claim related to the Golden Circle Property is being treated and paid as a fully secured claim in the case of Equaltox.  CSCSC will receive the treatment in Equaltox Class 2 in full settlement and satisfaction of its Claim in the |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

| General Unsecured Claims – Masood | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | of Claim 15-1 in Equaltox's case | | | Masood Case. CSCDC shall not receive any Distribution in the Masood Case. |
| 11 | First Citizens Unsecured Claim<br><br>Total Claim Amount: $473,727.58 per Schedules | N | Y | First Citizens' Claim is being treated and paid as a fully secured claim in the case of Equaltox. First Citizens will receive the treatment in Equaltox Class 3 in full settlement and satisfaction of any Claim in the Masood Case. First Citizens shall not receive any Distribution in the Masood Case. |
| 12 | CSCDC's General Unsecured Claim (Electric Avenue Property)<br><br>Total Claim Amount: $367,699.77 per Proof of Claim16-1 in Equaltox's case | N | Y | CSCDC's Claim related to the Electric Avenue Property is being treated and paid as a fully secured claim in the case of Equaltox. CSCSC will receive the treatment in Equaltox Class 2 in full settlement and satisfaction of its Claim in the Masood Case. CSCDC shall not receive any Distribution in the Masood Case. |
| 13 | UnitedHealthcare Insurance Company<br><br>Amount: $333,939.59 per Proof of Claim No. 10 | N | Y | The Claim of UnitedHealthcare Insurance Company is a Disputed Claim.<br><br>In the Masood Case, UnitedHealthcare Insurance Company shall receive the following:<br><br>On each Quarterly Distribution Date beginning on the Payment Commencement Date and continuing each calendar quarter thereafter until any Allowed Unsecured Claim of UnitedHealthcare Insurance Company is paid in full, UnitedHealthcare Insurance Company will receive a *pro rata* Distribution together with the Holder of any Allowed Claim in Class 16 from any Masood Available Cash remaining after payment of Allowed Masood Unsecured Trade Claims in Masood Class 8 in full.<br><br>The balance of any unpaid Allowed General Unsecured Claim of UnitedHealthcare Insurance Company shall receive the treatment in Equaltox Class 13.<br><br>Pending the allowance of UnitedHealthcare Insurance Company's asserted General Unsecured Claim by Final Order of the Court, any Distribution otherwise payable to UnitedHealthcare Insurance Company shall be reserved in accordance with Section III.H.3. below. UnitedHealthcare Insurance Company will be paid under the Plan only to the extent that, pursuant to a Final Order of the Court, UnitedHealthcare Insurance Company holds an Allowed Claim. |

51

| General Unsecured Claims – Masood | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Nelnet (student loan) Amount: $90,295.73 per Schedules | N | N | Any Allowed Claim of Nelnet will be paid in full by the Masood Reorganized Debtor continuing to make to Nelnet the monthly payments required by the applicable underlying documents evidencing such Claim. |

### c.    Kohzad Unsecured Claims

| General Unsecured Claims - Kohzad | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 7 | General Unsecured Claims Amount: $166,369.31 (estimated) | N | Y | The Holders of Allowed Kohzad General Unsecured Claims shall be paid 100% of such Holders' Allowed Masood Unsecured Claims in quarterly *pro rata* installments from Kohzad Available Cash as follows: Each Holder of an Allowed Kohzad General Unsecured Claim in this Class will receive a Pro Rata Payment from any Kohzad Available Cash on each Quarterly Distribution Date beginning on the Payment Commencement Date and continuing each calendar quarter thereafter until such Holder's Allowed Kohzad General Unsecured Claim is paid in full. To the extent that the any Kohzad Unsecured Claim is a Disputed Claim on a Quarterly Distribution Date, any Pro Rata Payment attributable for such Kohzad General Unsecured Claim shall be reserved as provided in Section III.H.3 below. The treatment proposed herein shall be in full settlement and satisfaction of the Kohzad General Unsecured Claims. Based on the Plan Projections and the assumptions used in preparing the Plan Projections, the Reorganized Debtors estimate that the Allowed Kohzad General Unsecured Claims in this Class will be paid in full within four (4) months by Kohzad Reorganized Debtor's receipt of the Kohzad SAM Funds. This date is an estimate only and the date upon which Allowed Kohzad General Unsecured Claims are paid in full in this Class could be earlier or later than the estimated date. |
| 8 | Mohela (student loan) | N | N | Any Allowed Claim of Nelnet will be paid in full by the Kohzad Reorganized Debtor continuing to make to Nelnet the monthly |

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| General Unsecured Claims - Kohzad | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | Amount: $104,865.54 per Schedules | | | payments required by the applicable underlying documents evidencing such Claim. |
| 9 | U.S. Small Business Administration ("SBA") Amount: $512,912.69 per Proof of Claim 6-1 | N | Y | The SBA asserts a General Unsecured Claim based on a guaranty of a loan by the SBA to The Duck House LLC.  The SBA's asserted General Unsecured Claim is a Disputed and contingent Claim.  Any Allowed Claim of the SBA shall be paid in full in monthly installments $1,424,75 beginning on the fifteenth (15th) of the second full calendar month after the Effective Date and continuing thereafter until any Allowed Claim is paid in full. The Reorganized Debtor may prepay any Allowed Claim of the SBA at any time and without penalty. The treatment proposed herein shall be in full settlement and satisfaction of the Class 9 Claim. |
| 10 | Sunnova (Peacock Hill Property) Amount: $56,989.41 per Proof of Claim 18-1 in Equaltox's case | N | N | Any Allowed General Claim of Sunnova related to the Peacock Hill Property by the Kohzad Reorganized Debtor continuing to make to Sunnova the monthly payments required by the applicable underlying documents evidencing such Claim. |
| 11 | Sunnova (Mall Way Property) Amount: $59,463.46 per Proof of Claim 19-1 in Equaltox's case | N | N | Any Allowed General Claim of Sunnova related to the Mall Way Property by the Kohzad Reorganized Debtor continuing to make to Sunnova the monthly payments required by the applicable underlying documents evidencing such Claim. |

### d.    General Unsecured Claim of Anthem

| Anthem General Unsecured Claim – Equaltox, Masood, and Kohzad | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 15; 15; 12[12] | Anthem General Unsecured Claim | N | Y | The Claim of Anthem is a Disputed Claim. Anthem asserts a Claim in each of the Cases. However, Anthem shall be entitled to one |

---

[12]  Treatment for Equaltox Class 15, Masood Class 15, and Kohzad Class 12.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

| Anthem General Unsecured Claim – Equaltox, Masood, and Kohzad | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | Total Amount: $8,002,602.51 per Proof of Claim 11-1 | | | recovery and satisfaction on account of any Allowed General Unsecured Claim. Anthem shall be paid 100% of its Allowed Claim, if any, in quarterly *pro rata* installments as follows: On each Quarterly Distribution Date beginning on the Payment Commencement Date and continuing each calendar quarter thereafter until any Allowed Unsecured Claim of Anthem is paid in full (collectively in the three Cases), Anthem will receive (1) *pro rata* Distributions with the Holder of any Allowed Claim in Masood Class 13 from any Masood Available Cash remaining after payment of Allowed Masood Unsecured Claims in Masood Class 8 in full, (2) *pro rata* Distributions from any Kohzad Available Cash remaining after payment of Allowed Kohzad Unsecured Claims in Kohzad Class 7 in full, and (3) *pro rata* Distributions with the Holder of any Allowed Claim in Equaltox Class 13 from any Equaltox Available Cash remaining after payment of Allowed Equaltox Unsecured Trade Claims in Equaltox Class 12 in full. Any Allowed Claim of Anthem shall accrue simple interest from the Effective Date until it is paid in full at the annual rate of 4.76%. Pending the Litigation Resolution Date, any Distribution otherwise payable to Anthem shall be reserved in a segregated disputed claim reserve account in accordance with Section III.H.3 below (the "Anthem Reserve Funds"). Anthem will be paid under the Plan only if and to the extent that, upon the Litigation Resolution Date, Anthem holds an Allowed Claim. Pending the Litigation Resolution Date, Anthem's Claim shall be deemed a "Disputed Claim" under the Plan. If and to the extent that, upon the Litigation Resolution Date, Anthem holds an Allowed Claim, then the Anthem Reserve Funds shall be released and paid to Anthem (up to the amount of such Allowed Claim) within thirty (30) days of such date. If and to the extent that, upon the Litigation Resolution Date, the Reorganized Debtors hold a judgment against Anthem, then any Allowed |

| | | | | Anthem General Unsecured Claim – Equaltox, Masood, and Kohzad |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Claim of Anthem shall be offset by such judgment. |
| | | | | Without limiting the scope and effectiveness of the discharge injunction in this Section, upon and after the Effective Date and pending any Uncured Default, the discharge injunction in Section V.3. of the Plan shall apply to, and shall enjoin, Anthem and any Claim of Anthem notwithstanding Anthem obtaining a Final Order excluding such Claim from the discharge in the Plan.  An "Uncured Default" shall constitute the failure of Anthem to receive a Distribution after the Litigation Resolution Date when due under the Plan that is not cured withing thirty (30) days of Anthem providing written notice of such asserted default to the Reorganized Debtors and their respective counsel. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of Anthem's Claim. Payment of any Allowed Claim of Anthem in full as provided in the Plan shall fully satisfy any Claim of Anthem that may be excepted from the discharge by Final Order of the Court. |
| | | | | Based on the Plan Projections and the assumptions used in preparing the Plan Projections, the Reorganized Debtors estimate that it will either pay any Allowed Claim of Anthem in full or reserve sufficient funds to do so (assuming Anthem holds an Allowed Claim) within 4 years of the Effective Date.  (*See* Ex. 1.)  This date is an estimate only and the date upon which Anthem's is paid in full in this Class could be earlier or later than the estimated date. |
| | | | | Anthem asserts a Claim in each of the Cases. However, Anthem shall be entitled to one recovery and satisfaction on account of any Allowed General Unsecured Claim and any Distributions received or reserved in connection with each Case shall reduce Anthem's Claim accordingly. |

5. **Class of Interest Holders**

Interest Holders are the parties who hold ownership Interests in Equaltox.  Masood and

Kohzad are individuals and have no Interest Holders.  The following chart describes the treatment

55

for Interest Holder in Equaltox.

| Class of Interests – Equaltox | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders | Impaired | Treatment |
| 16 | Masood | Y | Y | On the Effective Date, Masood shall retain all existing Equity Interests in Equaltox.  No distribution of any kind will be made on account of such existing Equity Interests until and unless all Allowed Claims are paid in full. |

**F.    Means For Implementation of the Plan**

This Section is intended to explain how the Reorganized Debtors intend to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Plan after the occurrence of the Effective Date.  This Section provides information regarding the funding sources for the Plan obligations and other material issues bearing upon performance of the Plan.

**1.    Funding of the Plan**

The Plan provides for the payment of all Allowed Claims in full on the terms set forth herein.  The Distributions to the Holders of Allowed Secured Claims secured by Estate Real Property or motor vehicles will be made from post-confirmation operations and cash flow.  The Distributions under the Plan to the Holders of Allowed Unsecured Claims shall be funded from the following four sources: (1) the Individual Debtors' respective shares of the SAM Funds; (2) Equaltox's Upfront Cash Payment as of the Effective Date and the Fixed Monthly Payment from the Equaltox Reorganized Debtor; (3) the Net Sale Proceeds from certain Estate Real Property; and (4) the Settlement Consideration.

On the Effective Date, Equaltox will pay to the Disbursing Agent $150,000 from the cash in its DIP Account (the "Upfront Cash Payment") for Distribution to the Holders of Allowed Claims in accordance with the terms of the Plan.

Beginning on the fifteenth (15th) day of the second full calendar month after the Effective Date (the "Monthly Payment Commencement Date") and continuing on the fifteenth (15th) day of each calendar month thereafter until all Allowed General Unsecured Claims in the Equaltox Case

56

are paid in full, Equaltox shall pay to the Disbursing Agent for payment to the Holders of Allowed

Unsecured Claims in accordance with the treatment in the Plan the following monthly payment

(the "Fixed Monthly Payment"): (1) from the Monthly Payment Commencement Date until the

fifteenth (15th) day of the first full calendar month after the Litigation Resolution Date, $50,000

per month; (2) from the fifteenth (15th) day of the first full calendar month after the Litigation

Resolution Date until the first Business Day that is one (1) year after such date, $100,000 per

month; and (3) each twelve (12) month period thereafter, the monthly payment shall increase by

$20,000 per month (up to a maximum amount of $160,000 per month) until all Allowed

Unsecured Claims are paid in full.

## 2. <u>Sale of Real Properties</u>

After the Effective Date, the Reorganized Debtors shall be authorized, but not required

(except as otherwise expressly set forth below in this Section III.F.2.), to sell any Estate Real

Property.  Pending payment of all Allowed Clams in full, the sale or encumbering of any Estate

Real Property shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real

Property shall not be sold or encumbered absent an order of the Court.  The Reorganized Debtors

may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

If, upon the Litigation Resolution Date, Anthem holds an Allowed Claim and the Anthem

Reserve Funds are insufficient to pay such Allowed Claim, then, to the extent necessary to pay

such Allowed Claim, (1) the Masood Reorganized Debtor shall cause Equaltox Management to

sell the Las Vegas Avenue Property, and (2) the Masood Reorganized Debtor and the Equaltox

Reorganized Debtor shall sell the Electric Avenue Property; provided, however, the Masood

Reorganized Debtor and the Equaltox Reorganized Debtor may postpone the sale of the Electric

Avenue Property until after the expiration of the Electric Avenue Property Lease Term and

provided the Purchase Option is not exercised in accordance with the terms of the Electric Avenue

Property Lease.

The Las Vegas Avenue Property Proceeds and the Net Sale Proceeds from the Electric

Avenue Property or any other Estate Real Property shall be paid from escrow directly to the

Disbursing Agent and shall be held and distributed to, or reserved for, the Holders of Allowed

57

1   Unsecured Claims in accordance with the terms of the Plan.

2         As an alternative to the sale any Estate Real Property as provided or required herein, the

3   Reorganized Debtors may incur or obtain financing secured by such property as necessary to pay

4   Allowed Claims in full pursuant to an order of the Court.

5   ### 3.    The Dissolution or Liquidation of SAM Reinsurance

6         Upon the Effective Date, the Individual Debtors and Lutfi are authorized and directed to

7   cause the dissolution of SAM Reinsurance in accordance with applicable state law (as may be

8   necessary or appropriate in order to distribute the SAM Funds to the Disbursing Agent as provided

9   herein), to pay the debts of SAM Reinsurance incurred in the ordinary course (including, without

10  limitation, such taxes and expenses arising from the dissolution of SAM Reinsurance), and to pay

11  the net SAM Funds remaining thereafter to the Disbursing Agent.  The funds in the SAM Account

12  shall not be transferred other than as permitted herein absent an order of the Court.  The Masood

13  SAM Funds, the Kohzad SAM Funds, and the Lutfi SAM Funds shall be distributed to the

14  Disbursing Agent to be distributed to, or reserved for, the Holders of Allowed Unsecured Claims

15  in the Cases in accordance with the terms of the Plan.

16  ### 4.    Settlement and Release of Alleged Estate Claims Against Insiders

17        The Plan represents a proposed settlement between the Debtors and their creditors.  In

18  exchange for the consideration, value, and benefits provided under the Plan, including without

19  limitation, Lutfi paying the fees and expenses incurred by the Debtors' Appellate Counsel in

20  connection with the Appeal and the waiver by Lutfi of any interest in, or the proceeds resulting or

21  arising from, SAM Reinsurance, the SAM Account, the SAM Funds, Equaltox Management, and

22  the Las Vegas Avenue Property (collectively, the "Settlement Consideration"), Masood, Kohzad,

23  Lutfi, and any other relative of Masood and Kohzad (collectively, the "Released Parties"), shall

24  each be deemed released and discharged, by the Debtors and their respective Estates, in each case,

25  on behalf of themselves and their respective successors, assigns, and representatives, and any and

26  all persons that may purport to assert any cause of action derivatively, by, through or on behalf of

27  each of the Debtors or their respective Estates, from any and all claims, obligations, suits,

28  judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities

whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, the Debtors, the Cases, the Estates, or any transfers listed or disclosed in the Disclosure Statement and/or the Debtors' respective Schedules and SOFAs (collectively, the "Released Claims"). The Confirmation Order shall operate has a bar and injunction against the commencement or pursuit of the Released Claims by any party against any Released Parties.

The Plan constitutes a good faith settlement and compromise, including of the Released Claims, in exchange for the Settlement Consideration. Under the Plan, and with the Settlement Consideration, Allowed Unsecured Claims are to be paid in full. Pursuit of any alleged claims, whether by one Debtor against another or against third parties, and the cost associated therewith, is unnecessary.

The Settlement Consideration exceeds any potential recovery on the Released Claims, without considering the risk and cost of litigation. For example, the face amount of the alleged avoidable transfers to Lutfi and M and L Consulting collectively total $1,772,166.50 *without* factoring in any costs of litigation and assuming any litigation is successful.[13] In contrast, the Debtors estimate that the Settlement Consideration will have a collective value of $2,338,800. Lufti's one third of the net proceeds from SAM Reinsurance is expected to total $646,800. The Debtors believe that, once developed, the Las Vegas Avenue Property will be worth approximately $3,500,000 to $3,700,000. Lutfi's asserted one-half share of the proceeds from the sale of the Las Vegas Avenue Property after costs of sale is estimated to be $1,692,000[14] ($1,692,000 + $646,800 = $2,338,800).[15] Moreover, all of the value associated the SAM Funds and the Las Vegas Avenue Property is being contributed to the Plan to pay all Allowed Unsecured Claims in full, for a grand total of $5,324,400 ($1,940,400, plus $3,384,000).

---

[13] This sum excludes biweekly payroll.

[14] $3,670,000 - $216,000 (6% costs of sale) = $3,384,000.

[15] This value does not include the fees and costs paid by Lutfi to Appellate Counsel.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

Based on the significant value to be paid under the Plan, the settlement embodied in the Plan is fair and equitable.

Attached to the Index as Exhibit "11" is a Plan Support Agreement reflecting Lufti's agreement to the compromise embodied to the Plan.

### 5.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Reorganized Debtors may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto – including, but not limited to, the sale of the Electric Avenue Property – shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption(s) specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan.

### 6.    Post-Confirmation Management

On the Effective Date, Masood will continue in his role as CEO/Manager of the Equaltox Reorganized Debtor and shall have sole authority to act on behalf of Reorganized Debtor Equaltox.  Kohzad and Lutfi shall continue in their respective roles as the Chief Pharmacist and head Clinical Laboratory Scientist, respectively.  To the extent that Equaltox's operating agreement is inconsistent with the Plan, the Plan shall control.

### 7.    Powers and Duties of the Reorganized Debtors

On and after the Effective Date and except as otherwise set forth in the Plan, and

60

notwithstanding anything to the contrary in Equaltox's operating agreement, the Reorganized

Debtors shall have the power and authority to take such actions as necessary to carry out and

implement the terms of the Plan, including, without limitation, the following:

    a.        Making the Distributions as required under the Plan;

    b.        Filing motions or commencing proceedings to determine the allowability,
classification, and priority of Claims and Interests;

    c.        Administering the terms of the Plan, the Confirmation Order, or any order of the
Court;

    d.        Opening or closing any accounts the Reorganized Debtors determine reasonable,
necessary, or required under the Plan;

    e.        Reviewing, approving, and paying the fees and costs incurred by professionals
retained by the Reorganized Debtors after the Effective Date;

    f.        Operate and use their respective revenues and cash provided they comply with the
payment terms in the Plan;

    g.        Filing, prosecuting, or compromising any Estate Claims; and

    h.        Filing motions or commencing proceedings to seek an injunction, judgment or
order, or taking any other action as may be necessary or appropriate to enforce the
terms of, or to restrain interference with, the Plan or the Confirmation Order.

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and

approved in all respects, subject to the provisions of the Plan, by virtue of entry of the

Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without

any further requirement of further action by the Reorganized Debtors.

### 8.  **Disbursing Agent; Employment of Professionals**

Joshua Teeple of Grobstein Teeple (the "Disbursing Agent") shall serve as the disbursing

agent for purposes of making all Distributions required to be made pursuant to the Plan.  The

Disbursing Agent shall not be required to obtain a bond.  The Disbursing Agent shall be entitled to

be paid hourly at his standard hourly rate for serving as the Disbursing Agent and the Disbursing

Agent is authorized to pay such fees from the funds in his possession without further notice,

10128929.1

motion, or order of the Court.

On or after the Effective Date, the Reorganized Debtors may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as they deem necessary and appropriate to assist in carrying out their respective rights or duties under the Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtors, as the case may be.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtors (the "Post-Confirmation Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtors and the Reorganized Debtors are authorized to pay such fees from the funds in his possession without further notice, motion, or order of the Court.

**G.      Release of Liens**

Except as otherwise expressly provided in the Plan for the Holders of Allowed Claims in Equaltox Classes 1-9, Masood Classes 1-2 and 5, and Kohzad Classes 1-4, or the Confirmation Order, or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against property of the estates shall be released.  The Reorganized Debtors shall be empowered to file such pleadings and/or record such documents or instruments as necessary to eliminate, expunge or release such liens from their respective assets.

**H.      Procedures For Resolving Disputed Claims**

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THESE CASES BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2024.

**1.      Standing**

With respect to each Case, on the Effective Date, the Reorganized Debtor and any other party-in-interest shall have standing to file objections to Claims.  An objection to any Claim, whether based on the Schedules or any proof of claim, may be filed after the Effective Date by such parties and there is no deadline after the Effective Date to file objections to Claims.  The

Reorganized Debtors may settle or compromise any Disputed Claim without approval or order of the Court, notice, or hearing.  The Reorganized Debtors shall be deemed the real party in interest in any objections to Claims commenced prior to or after the Effective Date.

### 2. **No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### 3. **Reserves for Disputed Claims**

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Disbursing Agent shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve for all Disputed Claims as otherwise required herein, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  Unless otherwise provided in the treatment with respect to a particular Claim, if a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of: (a) the Distribution Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall be returned to the Reorganized Debtors from whom the Cash contribution originated.

### I. **Distributions**

### 1. **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Effective Date.

10128929.1

1

2. **Distributions on Account of Claims Allowed After the Effective Date**

2

a. **Payments and Distributions on Disputed Claims**

3    Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant

4    parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed

5    Claim after the Effective Date shall be made as soon as practicable after the Disputed Claim

6    becomes an Allowed Claim.

7

b. **Special Rules for Distributions to Holders of Disputed Claims**

8    Notwithstanding any provision otherwise in the Plan, and except as otherwise agreed to by

9    the relevant parties, no partial payments and no partial distributions shall be made with respect to a

10    Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved

11    by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication

12    and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment

13    of such Claims.

14

3. **Delivery and Distributions and Undeliverable or Unclaimed**

15

**Distributions**

16

a. **Delivery of Distributions in General**

17    Except as otherwise provided herein, the Reorganized Debtors shall make distributions to

18    Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's

19    records as of the date of any such distribution or any Proof of Claim filed by that Holder.

20

b. **Undeliverable Distributions**

21    Distributions to Holders of Allowed Claims will be sent to the last known address set forth

22    on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof

23    of claim was filed.  Holders of Allowed Claims may change the address to which the distributions

24    will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of

25    the change of address on the Reorganized Debtors.  If a distribution is returned as undeliverable,

26    the Reorganized Debtors shall hold the distribution and shall not be required to take any further

27    action with respect to the delivery of the distribution unless and until the Reorganized Debtors are

28    notified in writing of the then-current address of the person or entity entitled to receive the

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

distribution. Unless and until the Debtor is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision below for distribution of Unclaimed Property.

<strong>c.      <u>Distributions of Unclaimed Property</u></strong>

If any distributions are returned to the Reorganized Debtors as undeliverable, then such distributions shall be deemed to be "Unclaimed Property."  Nothing contained in this Plan shall require the Reorganized Debtors, or anyone else, to attempt to locate such person or entity.  The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtors. If such person or entity presents itself within six (6) months of the date of the payment returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity.  If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

<strong>4.      <u>Compliance with Tax Requirements/Allocations</u></strong>

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

10128929.1

**J.    Treatment of Executory Contracts and Unexpired Leases**

**1.    Assumption of Executory Contracts and Unexpired Leases**

On the Effective Date, the Electric Avenue Property Lease and any executory contracts and unexpired leases identified on scheduled of executory contracts and unexpired leases to be assumed filed with the memo or pleading in support of confirmation of the Plan (the "Schedule of Assumed Agreements") shall be deemed assumed by the Reorganized Debtor(s), as the case may be.  The Schedule of Assumed Agreements will identify any amounts that must be paid to cure defaults under the executory contracts to be assumed under the Plan (the "Cure Amount").  The Debtors reserve the right to amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; (b) modify the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  The Cure Amount for the Electric Avenue Property Lease shall be $0.00.

Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a final determination of the Cure Amount and a final determination that the Debtors have shown adequate assurance of future performance.  Further, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults arising from, out of, or related to the executory contract or unexpired lease, including any claims that were or could have been asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and you object to the assumption of your lease or contract and/or you dispute the Cure Amount related to your

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

lease or contract, then you must file and serve upon the Debtors and their counsel a written objection within the deadline for objecting to the confirmation of the Plan.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Plan for such non-debtor party. If a dispute arises regarding (a) whether the Debtors have provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Debtors reserve the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative Cure Amount (an "Alternative Cure Amount"), then the Debtors may amend the Schedule of Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the right of the Reorganized Debtors to either, up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date (the "Cure Motion Deadline"), (1) file a motion to determine the appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely

67

1    forego assumption of, and, instead, reject the subject executory contract or unexpired lease. Any

2    such motion or notice of any such amendment will be served on the party to the executory contract

3    or unexpired lease affected by the motion (or its attorney, if any).  If the Reorganized Debtors do

4    not, by Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or amend

5    the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the

6    subject executory contract or unexpired lease, then the Cure Amount will be the Alternate Cure

7    Amount and the such amount will be paid to the applicable non-debtor party with fifteen (15) days

8    after the Cure Motion Deadline (unless otherwise expressly set forth in the Plan for such non-

9    debtor party).  If the Reorganized Debtors have filed such a motion and do not timely amend the

10    Schedule of Assumed Agreements within fifteen (15) days after entry of an order fixing the Cure

11    Amount, then the executory contract or unexpired lease shall be assumed, as of the Effective Date,

12    and the Cure Amount shall be fixed as the Cure Amount ordered by the Court. The Cure Amount

13    will be paid to the applicable non-debtor party as soon as reasonably practicable following the

14    expiration of the 15-day deadline or as otherwise expressly set forth in the Plan for such non-

15    debtor party.

16    **2.    Rejection of Executory Contracts or Unexpired Leases Not Assumed**

17    On the Effective Date, the Reorganized Debtors will be deemed to have rejected any and

18    all executory contracts and unexpired leases not identified on the Schedule of Assume

19    Agreements, including, without limitation, any lease(s) with GreatAmerica Financial Services

20    Corporation.  The Confirmation Order will constitute a Court order approving the rejection, as of

21    the Effective Date, of such executory contracts and unexpired leases.  Any Claim for damages

22    arising from the rejection under the Plan of any executory contract or unexpired lease must be

23    filed with the Court and served upon the Reorganized Debtors and their counsel within thirty (30)

24    days of the later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed

25    Agreements by the Debtors to eliminate the executory contract or unexpired lease.  Any such

26    damage Claims that are not timely filed and served will be forever barred and unenforceable

27    against the Debtors, the Reorganized Debtors, the Estates and their respective property.  Persons

28    holding these Claims who fail to timely file Claims will be barred from receiving any

10128929.1

1   Distributions under the Plan on account of their requested damage Claims.

2        IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU

3   OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE

4   AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE

5   CONFIRMATION OF THE PLAN.

6        **K.        Preservation of Causes of Action and Avoidance Actions**

7        The Plan reserves for the Reorganized Debtors all rights to commence and pursue, as

8   appropriate, any and all Estate Claims (excluding the Released Claims), whether arising prior to or

9   after the Petition Date, in any court or other tribunal.  On the Effective Date, the Reorganized

10  Debtors are vested with authority to enforce, file, litigate, prosecute, settle and collect their

11  respective Estate Claims (excluding the Released Claims), including Avoidance Actions, although

12  the Reorganized Debtors will not be required to do so unless they determine that doing so would

13  be in the best interests of their Creditors or Interest Holders.  The Estate Claims reserved for the

14  Reorganized Debtors to pursue after the Effective Date under the Plan specifically include and any

15  and all claims of the Debtors or the Estates against Anthem, including, without limitation, the

16  claims asserted by the Debtors in the Anthem Action or otherwise related to or arising from the

17  facts alleged in the Anthem Action.  In addition, the appeal of the Judgment of the Debtors and the

18  Estates are preserved for the Reorganized Debtors to continue to pursue on and after the Effective

19  Date.

20       While the Debtors have attempted to identify Estate Claims in the Disclosure Statement

21  which may be pursued, and hereby incorporate by reference those disclosures and provisions, the

22  failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to

23  limit the rights of the Debtors or the Reorganized Debtors to pursue any Estate Claim.  Unless an

24  Estate Claim against any Person is expressly waived, relinquished, released, compromised or

25  settled as provided or identified in the Plan, any Confirmation Order or prior Bankruptcy Court

26  order, the Debtors and Reorganized Debtors expressly reserve Estate Claims (excluding the

27  Released Claims) for later adjudication.  Therefore, no preclusion doctrine, including, without

28  limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable or otherwise) or laches shall apply to any Estate Claim upon or after Confirmation or consummation of the Plan.

All Estate Claims (excluding the Released Claims) are preserved under the Plan for the benefit of the Estates and the Reorganized Debtors.  The Reorganized Debtors may settle or compromise any Estate Claims without further notice, motion, or order of the Bankruptcy Court. Any Net Recoveries on Estate Claims shall be used to make payments on account of Allowed Claims and/or Interests in accordance with the terms of the Plan.

Notwithstanding anything in this Section III.K. to the contrary, the Released Claims are released as provided in Section III.H.3.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION. HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE OR OTHER LAW.

**L.**    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all entities with respect to all matters related to the Cases, the Debtors, the Reorganized Debtors, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any and all objections to the allowance or priority of any Claim;

2.     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.     Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any of the Debtors is a party;

4.     Resolve any issues related to any matters adjudicated in the Cases;

5.     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan;

8.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

9.     Issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

10.    Enforce the terms of the Plan;

11.    Enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.    Resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument,

71

release, indenture or other agreement or document adopted in connection with the Plan; and

13.      Enter an order concluding the Cases.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as deadlines for filing claims. The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a plan.  Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the plan is feasible.  These requirements are NOT the only requirements for confirmation.

### A.    Who May Vote on or Object to the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.

### B.    Who May Vote to Accept or Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) Allowed or allowed for voting purposes, (2) classified in an impaired class, and (3) entitled to receive or retain some property on account of its Claim.

### C.    What Is an Allowed Claim or Interest

As noted above, a creditor or interest holder must first have an Allowed Claim or Interest to have the right to vote.  Generally, any Proof of Claim or Interest will be Allowed, unless a party

in interest files an objection to the Claim or Interest.  When an objection to a Claim or Interest is filed, the Person holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE ON ACCOUNT OF PRE-PETITION CLAIMS WAS **FEBRUARY 20, 2024**.  A creditor may have an Allowed Claim even if a Proof of Claim was not timely filed. A Claim is deemed an Allowed Claim if (1) it is scheduled on the Debtors' Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim.  An Interest is deemed an Allowed Interest if it is scheduled and no party in interest has objected to the Interest.

### D. <u>What Is an Impaired Claim or Interest</u>

As noted above, the Holder of an Allowed Claim only has the right to vote if it is in a Class that is impaired under the Plan.  A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what they are owed or otherwise impairs the legal rights of the Holders of the Claims.

In this case, the Debtors believe that the following Classes are impaired—Equaltox Classes 1-6, 8, 10-14, and 16; Masood Classes 1, 3-13, and 15; and Kohzad Classes 1-7, 9, and 12—and therefore entitled to vote to accept or reject the Plan.  Parties who dispute the Debtors' characterization of their Claims or Interests as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

### E. <u>Who Is Not Entitled to Vote</u>

The following four types of claims are not entitled to vote: (1) Claims that are not Allowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not

placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE (AND UNABLE TO VOTE), YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### F.    Who Can Vote in More Than One Class

A creditor whose Claim is an Allowed Claim in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim.  Also, a creditor who has a Claim for wages or unpaid vacation, healthcare or retirement benefits may have both a Priority Claim up to the maximum specified in Bankruptcy Code section 507(a)(4) and (a)(5), provided the conditions for priority treatment as specified under Bankruptcy Code section 507(a) are met, and a General Unsecured Claim for all amounts exceeding the statutory maximum. The Holder of such a Claim may cast a ballot for the priority portion of the Claim and another ballot for the general unsecured portion of the Claim.

### G.    Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed below.

### H.    Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan.  A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest Holders of such Class which actually voted, voted to accept the Plan.

### I.    Treatment of Non-Accepting Classes ("Cramdown")

If at least one impaired Class votes to accept the Plan, and other impaired Classes vote to

reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims if it meets all consensual requirements except the voting requirements of Bankruptcy Code section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as referred to in Bankruptcy Code section 1129(b) and applicable case law.

To meet the "fair and equitable" test set forth Bankruptcy Code section 1129(b), the Plan needs to comply with the "absolute priority rule."  In other words, as to a dissenting Class of General Unsecured Claims that will not be receiving or retaining property of a value that is equal to the Allowed General Unsecured Claim, holders of any claims or interests that is junior to such Class should not receive or retain any non-exempt property except those under § 1115.  However, under the "new value exception," a junior class may still retain property and meet the requirements of the absolute priority rule to the extent the junior class provides "new value," which is value that is: (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received.  Here, the "fair and equitable" test is satisfied because all Allowed Claims are being paid in full under the Plan.

The Debtors will ask the Court to confirm the Plan by "cramdown" on all impaired Classes if any of these Classes do not vote to accept the Plan.

The Plan satisfies the Absolute Priority Rule.  The Absolute Priority Rule is an issue only if an impaired Class of Unsecured Claims votes to reject the Plan.  If all impaired Classes vote to accept the Plan, then the Absolute Priority is not triggered.  Assuming the Plan must comply with the Absolute Priority Rule, it does so because, at a minimum, Allowed General Unsecured Claims are being paid in full.  Accordingly, the Plan can be confirmed whether or not the Absolute Priority Rule must be satisfied.

### J. <u>Liquidation Analysis</u>

To obtain confirmation of the Plan, the Debtors must show that the Plan meets the "Best

75

1    Interests of Creditors Test."  Under that test, if a claimant or interest holder is in an impaired

2    class and that claimant or interest holder does not vote to accept the Plan, then that claimant or

3    interest holder must receive or retain under the Plan property of a value not less than the amount

4    that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the

5    Bankruptcy Code.

6        In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured

7    creditors are paid first from the proceeds of the sales of properties on which those creditors have

8    liens.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining

9    sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority

10   share in proportion to the amount of their allowed claim in relationship to the amount of total

11   allowed unsecured claims.  Finally, interest holders receive the balance that remains after all

12   creditors are paid, if any.

13       In order for the Court to be able to confirm this Plan, the Court must find that all creditors

14   and interest holders who do not accept the Plan will receive at least as much under the Plan as

15   such holders would receive under a Chapter 7 liquidation.

16       The Debtors believe that the Best Interests Test is met.  The Liquidation Analysis is

17   attached to the Index as Exhibit "3."  As demonstrated by the Liquidation Analysis, the Holders of

18   Allowed Claims will receive significantly more under the Plan than in a chapter 7 liquidation.  **In**

19   **short, under the Plan, the Debtors are proposing to pay 100% of Allowed Claims**.  Creditors

20   cannot do better in a Chapter 7.  Moreover, as set forth in the attached Liquidation Analysis, in a

21   Chapter 7 liquidation, the Holders of Allowed Claims would receive far less in each Case as

22   follows:

| Case | % |
|------|---|
| Masood Case | 17.7% |
| Kohzad Case | 21.7% |
| Equaltox Case | 29.6% |

28       The Plan results in more value to creditors than a chapter 7 liquidation for multiple

76

1    reasons.  The Distributions through the Plan will be more efficient and less costly than the

2    liquidation of such assets in a chapter 7, which would result in a trustee unfamiliar with this case

3    and a new set of professionals representing such trustee.  Such new professionals would need to

4    become familiar with this case.  The appointment of a trustee and his or her retention of new

5    professionals could delay any distributions and would result in an additional layer of

6    administrative expenses.  Greater administrative expenses, in turn, would further reduce the

7    amount available to pay the Holders of Allowed Unsecured Claims.

8         The Plan increases the value available for the Holders of Allowed Claims.  First, Holders

9    of Allowed Claims in the Equaltox Case have the benefit of the value of Equaltox's post-Effective

10   Date operations.  The Equaltox Reorganized Debtor is committing to the Fixed Monthly Payment

11   until its Allowed Unsecured Claims are paid in full.  In a Chapter 7 liquidation, operations of

12   Equaltox would cease.

13        Second, the funding of the Plan includes value from non-Estate sources.  The funds in the

14   SAM Account in the name of SAM Reinsurance will be used to pay Allowed Unsecured Claims in

15   full in the Individual Debtors' cases.  In addition, if and to the extent needed to pay Disputed

16   General Unsecured Claims upon allowance, the Las Vegas Avenue Property, which is in the name

17   of Equaltox Management, will be sold.  The total value from these sources is estimated at

18   $5,324,400.  This value includes the Settlement Consideration, *i.e.*, Lutfi's share of the SAM

19   Funds and the Las Vegas Avenue Property (estimated at a combined value of $2,338,800).

20        While, in a Chapter 7 liquidation, a trustee could attempt to reach certain of these assets or

21   pursue alleged avoidable transfer claims, he or she could be required to incur the attorney's fees

22   and costs of litigating the alleged claims and would face the risk that he or she either would not

23   prevail in such litigation or be able to collect any judgment obtained.  Any recovery – in addition

24   to being far from certain – would be diluted by the cost of such litigation, including the fees paid

25   to a Chapter 7 trustee and such trustee's counsel.

26        Moreover, any recovery on such claims would be delayed until the litigation and any

27   appeals were concluded.  The Plan avoids the costs, risk, and delay of litigation and the Holders of

28   Allowed Claims with value that far exceeds the recoveries that could potentially be achieved in a

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

chapter 7 liquidation and more quickly.

All amounts contained in the Liquidation Analysis and described in the notes to the Liquidation Analysis are based on the information discussed above and are GT's good faith estimates of the projected amounts that a Chapter 7 trustee would receive from the liquidation of the estates' assets.  The amounts, descriptions, and other information contained herein do not constitute an admission of the amounts of any Claims or an admission or a denial of the existence or values of the assets or liabilities, and are not to be used as such in any legal action, administrative proceeding, or otherwise.  The projections, estimates and notes to this Liquidation Analysis were prepared solely to assist the Bankruptcy Court in making the findings required under Bankruptcy Code section 1129(a)(7) of the Bankruptcy Code and they may not be used or relied upon for any other purpose.

The information contained in this Liquidation Analysis is as of February 22, 2024.  The Debtors are under no obligation, and expressly disclaim any obligation to publicly update any of the information contained herein, whether as a result of new information, future events, or otherwise.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

More specifically, the Debtors believe that there can be no assurance as to the values that

78

would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a

Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in

making its determinations under Bankruptcy Code section 1129(a)(7).  For example, the

Liquidation Analysis necessarily contains an estimate of the amount of the Allowed Claims, which

is based on the amounts of the Claims as listed in the Debtors' Schedules or in the Proofs of

Claims filed by the claimants (some of which are subject to dispute by the Debtors), as well as

estimated Administrative Expense Claims, Priority Unsecured Claims, and Professional Fee

Claims.  These estimates are based solely upon the Debtors' analysis of the Schedules, the claims

asserted against the Debtors, and the Proofs of Claim on file, and the Debtors' estimates as to

additional Administrative Expense and other Claims that may arise in the event of a conversion of

the case from Chapter 11 to Chapter 7.  No order or finding has been entered by the Bankruptcy

Court or any other court estimating or otherwise fixing the amount of Claims at the projected

amounts of Allowed Claims set forth in the Liquidation Analysis.  The estimate of the amount of

Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other

purpose, including any determination of the value of any Distribution to be made on account of

Allowed Claims under the Plan.  The Liquidation Analysis is being provided solely to disclose to

Holders of Claims the potential recoveries in a hypothetical Chapter 7 liquidation of the Debtors,

subject to the assumptions set forth therein. Nothing herein or in the Liquidation Analysis shall be

deemed as an admission as to the allowed amount of any Claim.

### K.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan.  This means that

confirmation of the Plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless

such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.

### 1.    Effective Date Payments

The first aspect considers whether there will be enough cash on the Effective Date of the

Plan to pay all Allowed Claims and expenses which are entitled to be paid on such date.  As

79

demonstrated by the Plan Projections, the Debtors estimate to have sufficient funds to pay the

Professional Fee Claims in their respective cases upon allowance from the receipt of SAM Funds,

the Settlement Consideration, and Equaltox's Upfront Cash Payment.  However, to the extent that

the Debtors lack the cash on the Effective Date to make payments to the Debtors' Professionals,

the Debtors expect that such Professionals will agree, if the Plan is confirmed, to the payment of

their respective Allowed Claims over time as reflected in the Plan Projections attached to the

Index as Exhibit "1" to facilitate feasibility of the Plan.  Thus, the Debtors expect to have

sufficient funds on hand as of the Effective Date in order to pay Allowed Administrative Claims

that must be paid on that date.

## 2.    Post-Effective Date Payments

The second aspect of feasibility considers whether there will be enough cash over the life

of the Plan to make the Distributions required by the Plan when required by the Plan.  The

payments required under the Plan after the Effective Date generally fall into two categories,

payments to secured creditors, and payment to unsecured creditors.

The payments to secured creditors are feasible.  The Plan requires monthly payments to the

Holders of Allowed Secured Claims in accordance with such Holders' respective underlying

agreements.  The Debtors believe the amount and timing of such payments are reasonable in light

of Reorganized Debtors' projected income and the terms of such creditors' applicable credit

agreements.  The Debtors have made monthly payments post-petition and can continue to do so

after confirmation.

The payments to unsecured creditors also are feasible.  The Plan does not require that

Allowed Unsecured Claims be paid by any fixed date.  Rather, the Plan provides for value from a

variety of concrete sources, including Cash and real property, as needed to pay Allowed Claims.

The Holders of Allowed General Unsecured Trade Claims and Allowed General Unsecured

Claims in each Case are projected to be paid in full from the Equaltox, Masood and Kohzad

Available Cash in such Case.  A key component of the cash available for payment of the

undisputed Allowed Claims in each Case is the funds in the SAM Account.  As demonstrated by

the Liquidation analysis, the Reorganized Debtors are contributing value that collectively is

80

sufficient to pay all General Unsecured Claims in full (assuming Allowed).

More specifically, each Individual Debtor's share of the SAM Funds is sufficient to pay the Allowed General Unsecured Claims in his case and Equaltox Available Cash is sufficient to pay the Allowed General Unsecured Trade Claims in the Equaltox Case. All remaining creditors (*i.e.*, Holders of Disputed Claims) will receive Distributions only after their Claims become Allowed Claims. Until that time, the distributions otherwise payable to the Holders of Disputed Claims Reserve will be reserved. However, the Debtors believe that the payment of all such Claims in full (if Allowed) is feasible based on the expected amount of such claims. Moreover, the Equaltox Fixed Monthly Payment will continue until is Allowed Unsecured Claims are paid in full.

The Fixed monthly Payment is feasible. The Equaltox Projections were developed based on the Equaltox's post-confirmation operations and, therefore, are reliable. Equaltox is projected to operate on a cash flow positive basis after the Effective Date as it has consistently done to date. Moreover, the amount of the Fixed Monthly Payment was determined in order to be feasible based on Equaltox's post-petition operations. The Equaltox will continue to set aside the Fixed Monthly Payment until all Allowed Unsecured Claims are paid in full.

The debtors have included with this Disclosure Statement historical information concerning Equaltox's operations (both pre-petition and post-petition). Also included with the Index in support of the Disclosure Statement are the Plan Projections (*see* Exhibit "1"), which projects the payment of Allowed Unsecured Claims under the Plan, and Equaltox Projections (*see* Exhibit "2"), which projects Equaltox's revenues and expenses. While the projected cash flow upon which the Plan is based is subject to a variety of unpredictable outside forces and circumstances that could adversely affect the projections, the Debtors believe such projections are reasonable and conservative. Nonetheless, certain factors may be outside of the Debtors' present control.

FINANCIAL PROJECTIONS PROVIDED WITH DISCLOSURE STATEMENT WILL REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN ASSUMPTIONS SET FORTH WITH SUCH FINANCIAL PROJECTIONS. THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND ANY FINANCIAL PROJECTIONS MAY NOT

81

1    BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL

2    RESULTS WHICH WILL OCCUR. BECAUSE OF THE UNCERTAINTIES INHERENT IN

3    PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE PROPONENTS'

4    CONTROL, THE REORGANIZED DEBTORS' ACTUAL CASH FLOW MAY WELL BE

5    DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL

6    AND ADVERSE TO THE INTERESTS OF CREDITORS.

7

8    **V.    EFFECT OF CONFIRMATION OF THE PLAN**

9         **1.    Binding Nature of Plan**

10        CONFIRMATION OF THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND

11   INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW,

12   NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR

13   RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS

14   FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASES OR (III)

15   FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE

16   PLAN.

17        **2.    Discharge**

18        The Equaltox Debtor will receive a discharge upon the entry of the Confirmation Order.

19   The Individual Debtors seeks a discharge as of the Disbursing Agent's receipt of the SAM Funds.

20   The Individual Debtors asserts that "cause" exists for a discharge upon confirmation of the Plan

21   because, upon the Effective Date, their obligations under the Plan with respect to the payment of

22   their respective Allowed General Unsecured Claims are complete at such time.  Nothing herein

23   shall limit the effect of confirmation as described in §§ 524 and/or 1141 of the Bankruptcy Code.

24        Upon discharge, the Reorganized Debtors and his assets will, to the fullest extent permitted

25   by § 1141 of the Bankruptcy Code, including, without limitation as provided in § 1141(d)(1)(A) of

26   the Bankruptcy Code, be deemed discharged and released from any and all Claims, obligations,

27   suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and

28   liabilities of any nature whatsoever, whether known or unknown, that arose before the Effective

82

Date or that are based upon, arise from, or otherwise relate to acts, events, omissions, transactions, or other activities of any kind that occurred before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each case, regardless of whether: (1) a proof of claim based on such a debt is filed or deemed filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the person holding the Claim based on such a debt has accepted the Plan; provided, however, that in no event shall the Debtors be discharged of any obligations remaining under the Plan as of the Effective Date.

As to each Debtor, except as expressly provided in the Plan, pursuant to section 1141(d)(5)(A), the Confirmation Order will be a judicial determination of discharge of all liabilities of such Debtor to the fullest extent allowed under section 1141 of the Bankruptcy Code. The Reorganized Debtors will not be liable for any Claims and will only have any obligations that are specifically provided for in the Plan.  Holders of any Claims or debts against the Debtors (or any of them) will, upon the Effective Date, be enjoined from taking any action to collect, recover, or offset any such Claim or debt against the Reorganized Debtors (or any of them) or as a personal liability of the Reorganized Debtors.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all persons will be precluded from asserting or pursuing against the Reorganized Debtors, the Estates, the Disbursing Agent, or their respective property any Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Effective Date, and any debt of the Debtor or Claim against the Debtors (or any of them), whether secured or unsecured, which was in default up to the Effective Date, will no longer be deemed in default and will be deemed in good standing.

### 3. <u>Injunction</u>

All Persons or entities who have held, hold, or may hold Claims (other than Claims that are unimpaired under the Plan), and all other parties in interest in the Cases, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claim or cause of action treated, discharged, released, or settled under the Plan, (i)

83

commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against the Reorganized Debtors; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Reorganized Debtors; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Reorganized Debtor; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Reorganized Debtors, or against the property or interests in property of the Debtors or Reorganized Debtors, on account of such Claims; or (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Plan; provided, however, that nothing contained herein shall preclude such entities from exercising their rights pursuant to and consistent with the terms of the Plan.

### 4. <u>Vesting of Property in the Reorganized Debtors</u>

Except as otherwise provided in the Plan, the confirmation of the Plan vests title to all property whatsoever of the Debtors and the estates in the Reorganized Debtors on and after the Effective Date, free and clear of all claims and interests.

### 5. <u>Modification of the Plan</u>

The Debtors may modify this Plan at any time before confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan.  The Debtors may also seek to modify this Plan at any time after confirmation only if (1) this Plan has not been substantially consummated, and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6. <u>Exculpations and Releases</u>

To the maximum extent permitted by law, neither the Debtors, the Reorganized Debtors, nor any of their professionals employed or retained by any of them (collectively, the "Exculpated Parties"), shall have or incur liability to any person or entity for any Official Actions taken or omission made in good faith in connection with or related to the formulation and implementation

of this Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of this Plan, or the consummation and implementation of this Plan and the transactions contemplated thereby.

### 7. Submission of Post-Confirmation Reports

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtors shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on each of the following or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties that receive notice of electronic filings in the Chapter 11 Cases. Further status reports shall be filed every 120 days and served on the same entities.

### 8. Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date. Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the applicable Reorganized Debtors until a final decree, or the entry of an order dismissing the Case or converting the Cases to Chapter 7, at the rate in effect at the time such fees are due.

### 9. Post-Confirmation Conversion/Dismissal

After the Plan is confirmed, a creditor or party in interest may bring a Motion, only after notice and a hearing, to convert or dismiss the Chapter 11 Cases under Bankruptcy Code section 1112(b) if there is a material default in performing the Plan. If the Bankruptcy Court orders the Chapter 11 Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the estates and vested in the Reorganized Debtors, and that has not been distributed under the Plan will revest in Chapter 7 estates. The automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Bankruptcy Court during the Chapter 11 Cases.

The Confirmation order may also be revoked under very limited circumstances. The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest bring an adversary proceeding to revoke the confirmation within 180 days after the entry

of the Confirmation Order.

### 10. <u>Final Decree</u>

Once the estates have been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtors will file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Cases. The Reorganized Debtors shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

## VI.    <u>RISK FACTORS REGARDING THE PLAN</u>

Performance of the obligations under the Plan are subject to various factors and contingencies, some of which are described in this section. The following discussion summarizes some of the material risks associated with the Plan, but is not intended to be exhaustive. Moreover, it should be read in connection with the other disclosures contained in this Disclosure Statement and the Plan. Each creditor, in conjunction with its advisors, should supplement the following discussion by analyzing and evaluating the Plan and the Disclosure Statement as a whole. THE RISKS ASSOCIATED WITH THE PLAN MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE PLAN.

The Plan will be funded from the liquidation of the SAM Account, Equaltox's post-confirmation operations, and the sale or refinance of the Las Vegas Avenue Property and the Electric Avenue Property.

As set forth in the Equaltox Projections, Equaltox is projected to operate on a cash flow positive basis after the Effective Date. However, the Plan Projections are a mere estimate of Equaltox's post-Effective Date operations and are based on certain assumptions. There is a risk that Equaltox's actual post-Effective Date operations are materially different from the Equaltox Projections. Sales could be less than expected and/or expenses can be more than expected, either of which could impact Equaltox's ability to make the Fixed Monthly Payment (as originally contemplated or as it increases).

Additionally, it is possible that the projected value of the Las Vegas Avenue Property will not be realized due to market conditions or based on a disruption in the development of the

property or the relationship between Equaltox Management (which owns the property) and the tenant.  There is a risk that the holder of the Purchase Option with respect to the Electric Avenue Property does not exercise such option and the Electric Avenue Property is sold for less than expected.  If the values of the real property to be sold under the Plan are not as estimated <u>and</u> Equaltox's operations do not produce the cash flow presently projected, then there is a risk that the Reorganized Debtors may not be able to contribute enough cash to pay all Disputed Claims to the extent that they become Allowed Claims within the time currently projected or in full.

**VII.    <u>TAX CONSEQUENCES OF THE PLAN</u>**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Debtors CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

At this time, it is projected that there will be no federal or state income tax due from the implementation of the Plan.

**VIII.    <u>CONCLUSION AND RECOMMENDATION</u>**

The Debtors believe that the Plan is in the best interests of all stakeholders and urge the Holders of Allowed Claims to vote in favor of the Plan.

DATED:  February 23, 2024          ELKINS KALT WEINTRAUB REUBEN
                                   GARTSIDE LLP


                                   By:      _/s/ Roye Zur_____
                                            ROYE ZUR
                                            Attorneys for Debtors and Debtors-in-Possession
                                            Sulaiman Masood and Ahmad Ali Kohzad


DATED:  February 23, 2024          RAINES FELDMAN LITTRELL LLP


                                   By:      _/s/ Robert S. Marticello_____
                                            ROBERT S. MARTICELLO
                                            Attorneys for Debtor and Debtor-in-Possession
                                            Equaltox, LLC

# TABLE OF DEFINITIONS

### A.    Definitions

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

"Administrative Claim" means a Claim for costs and expenses of the administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a Claim of a Professional employed at the expense of the Estate and any fees or charges asserted against the Estate under 28 U.S.C. § 1930.

"Administrative Tax Claim" means an Administrative Claim or other Claim that is not an Allowed Secured Claim and that a government unit asserts against Debtors for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

"Allowed" means a claim that is either (i) listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to which a proof of claim has been filed by the Claims Bar Date, and as to which no objection was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order.  The amount of an Allowed Claim shall be as follows: (a) if the creditor did not file a proof of claim with the Bankruptcy Court on or before the Claims Bar Date, (1) the amount of the creditor's Claim as listed in the operative Schedules as not disputed, contingent, unliquidated or unknown, or (2) the amount fixed by Final Order of the Bankruptcy Court in resolving any timely filed objection or

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

other motion disputing the amount of such Claim; or (b) if the creditor filed a proof of claim with the Bankruptcy Court on or before the Claims Bar Date and the claim is not a Contingent Claim, (1) the amount stated in such proof of claim if no objection to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim for which a proof of claim is not filed by the Claims Bar Date and that is not listed in the Schedules or is listed in the Schedules as disputed, unliquidated, contingent or unknown shall be zero, and no distribution shall be made on account of such Claim.  An Allowed Claim shall not include any unmatured or post-petition interest unless otherwise stated in the Plan.

"Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim" means an Allowed Claim in the specified Class and/or of the specified type.

"Allowed Administrative Claim" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

"Allowed General Unsecured Claim" means an Allowed Unsecured Claim that is not entitled to priority.

"Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has as interest, or which is subject to setoff under Section 533 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the mount subject to any setoff as the case may be,

"Anthem" refers to both Blue Cross of California d.b.a. Anthem Blue Cross and Anthem Blue Cross Life and Health Insurance Company collectively.

"Anthem Action " means the lawsuit commenced on May 18, 2018 in Superior Court of California for the County of Orange, Case No. 30-2018-00993688-CU-FR-CJC, by Anthem against Equaltox, Masood, Kohzad, and others.

"Anthem Reserve Funds" means, pending the Litigation Resolution Date, the funds

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

reserved by the Disbursing Agent in a segregated disputed claim reserve account on account of Anthem's Disputed Claim as set forth in the Plan.

"Appeal" means the Defendants' appeal of the Judgment and Anthem's related cross-appeal.

"Avoidance Action" means causes of action arising under 11 U.S.C. §§ 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bankruptcy Cases" or "Cases" means, collectively, the jointly-administered bankruptcy cases of Equaltox, Masood, and Kohzad under chapter 11 of the Bankruptcy Code that are pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with lead Case No. 8:23-bk-12243-SC.

"Bankruptcy Code" or "Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California.

"Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a).

"Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

"Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and includes any claims based on, arising from, or connected with any work performed by the Debtor prior to the Petition Date, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment,

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claims Bar Date" means February 10, 2022, the date the Court set as the deadline for creditors to file proofs of claim against the Debtor's Estate.

"Class" means the group of Claims classified in the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

"Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the Plan.

"CSCDC" refers to the California Statewide Certified Development Corporation.

"Debtor" in the singular refers to either Equaltox, Masood, or Kohzad and, in the plural, refers to Equaltox, Masood, and Kohzad collectively.

"Debtors' Appellate Counsel" means Greines, Martin, Stein & Richland LLP.

"Defendants" means the defendants in the Anthem Action, including Equaltox, Masood, and Kohzad in such capacities.

"Disclosure Statement" means the *Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization*, including as may be further amended or modified.

"Disputed Claim" means all or any part of a Claim that is the subject of a timely objection or request for estimation which is filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order.  In addition, prior to (a) the Claims Objection Deadline, or (b) if prior to the Claim Objection Deadline, a motion to disallow or estimate the Claim is filed, such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the proof of claim is listed in the Schedules, (2) the Claim corresponding to the proof of claim is listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the Claim as specified in the Proof of Claim exceeds the amount of

92

any corresponding Claim listed in the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the priority or classification of the Claim as specified in the Proof of Claim differs from the priority of any corresponding Claim listed in the Schedules.

"<u>Distribution</u>" means the Cash that is required to be distributed under this Plan to the holders of Allowed Claims and Interests.

"<u>Effective Date</u>" means the date that is the fifteenth (15th) day after entry of the Confirmation Order.

"<u>Electric Avenue Property</u>" refers to the real property located at 8100 Electric Avenue, Stanton, CA 90680

"<u>Electric Avenue Property Lease</u>" refers to the lease of the Electric Avenue Property from Masood to West Coast Alliance.

"<u>Electric Avenue Property Lease Term</u>" refers to the lease term of the Electric Avenue Property Lease of October 4, 2021, through and including October 4, 2026, as set forth in the Electric Avenue Property Lease.

"<u>Equaltox</u>" refers to Equaltox, LLC.

"<u>Equaltox Available Cash</u>" means the Equaltox Upfront Cash Payment, Fixed Monthly Payment, any Equaltox Net Sale Proceeds, Equaltox's interest in and to Las Vegas Avenue Property Proceeds, and the Settlement Consideration reaming after the payment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Unsecured Claims in full.

"<u>Equaltox Management</u>" refers to Equaltox Management, Inc.

"<u>Equaltox Projections</u>" means Equaltox's post-confirmation financial projections attached to the Index as Exhibit "2."

"<u>Equaltox Net Sale Proceeds</u>" means any Cash proceeds from the liquidation of Equaltox Real Properties after the amounts necessary to pay or reserve for in full (a) Allowed Claims secured by such properties or other liens, security interests, or encumbrances on such properties, (b) customary and ordinary costs of sale, including any brokerage commissions, and (c) any taxes,

fees and/or penalties caused or resulting from the sale of any of the Debtor's assets, including, without limitation, any capital gains tax.

"Equaltox Real Properties" means any real property that Equaltox asserts an interest in, including the Golden Circle Property, the Electric Avenue Property, and the Las Vegas Avenue Property.

"Equaltox Upfront Payment" means the payment of $150,000 to be made by Equaltox from its cash on hand.

"Equipment Sale Proceeds" means the net Cash proceeds received by Equaltox from the sale of the 1 AB Sciex Triple Quad 6500, SN CF 22591704H1 after the payment of the Court-approved brokerage commissions.

"Estate" means the bankruptcy estate of either Equaltox, Masood, or Kohzad created under Section 541 of the Bankruptcy Code in the Case.  When used in the plural, it means the collective bankruptcy estates of Equaltox, Masood, and Kohzad.

"Estate Claims" means any and all claims and causes of action that constitute property of the Estate including, but not limited to, any Avoidance Actions, equitable subordination or debt recharacterization actions against creditors or principals of the Debtor, any causes of action or claims for recovery of any amounts owing to the Debtor or the Estate, and any claims or causes of action against the Debtor's insurance carriers.

"Estate Real Property" means any real property that an Estate has an interest in.

"File," "Filed," or "Filing" means duly and properly filed with the Court and reflected on the Court's official docket.

"Final Order" means an order or judgment entered by the applicable court on its docket.

a.    That has not been reversed, rescinded, stayed, modified, or amended;

b.    That is in full force and effect;

c.    With respect to which the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; and

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN

10128929.1

d.      With respect to which any appeal, motion or petition for review, remand, rehearing, or reconsideration, or writ of certiorari that is Filed has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, reconsideration, or a writ of certiorari was sought, and any remanded or further proceedings following such appeal, petition, or writ have been resolved by Final Order.

"First Citizens" refers to First Citizens Bank & Trust.

"Fixed Monthly Payment" means the fixed monthly payment to be made by Equaltox to the Disbursing Agent in the amount set forth, and in accordance with Section III.F.1 of the Disclosure Statement.

"General Unsecured Trade Claim" means a General Unsecured Claim Against Equaltox excluding any Claim of Anthem or UnitedHealthcare Insurance Company.

"Golden Circle Property" means the real property located at 550 N. Golden Circle Dr., Santa Ana, California 92705.

"Greenwich Property" refers to the real property located at 511 S. Greenwich St., Anaheim, CA 92804.

"Holder" means an entity holding a Claim.

"Individual Debtor" refers to either Masood or Kohzad.  When used in the plural, it means both Masood and Kohzad.

"Interest" means any "equity security" as provided by Section 101(16) of the Bankruptcy Code.

"Judgment" means the judgment entered by the Superior Court on July 5, 2023 in favor of Anthem and against each of the Debtors and certain other non-debtor defendants.

"Kohzad" refers to Ahmad Ali Kohzad.

"Kohzad Available Cash" means the Kohzad SAM Funds and any Kohzad Net Sale Proceeds remaining after the payment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Unsecured Claims in full.

"<u>Kohzad Net Sale Proceeds</u>" means any Cash proceeds from the liquidation of Kohzad Real Properties after the amounts necessary to pay or reserve for in full (a) Allowed Claims secured by such properties or other liens, security interests, or encumbrances on such properties, (b) customary and ordinary costs of sale, including any brokerage commissions, and (c) any taxes, fees and/or penalties caused or resulting from the sale of any of the Debtor's assets, including, without limitation, any capital gains tax.

"<u>Kohzad Real Properties</u>" means any real property that Kohzad asserts an interest in, including the Greenbriar Property, Peacock Hill Property, and the Mall Way Property.

"<u>Kohzad SAM Funds</u>" means Masood's share of any proceeds distributed by SAM Reinsurance on account of Kohzad's one-third membership interest therein after the payment of debts of SAM Reinsurance incurred in the ordinary course and any taxes or expenses arising or resulting from the dissolution of SAM Reinsurance or the distribution of proceeds to or on account of Kohzad.

"<u>Las Vegas Avenue Property</u>" means the real property located at 25825 Las Vegas Avenue, Dana Point, CA 92624.

"<u>Las Vegas Avenue Property Proceeds</u>" means the Cash proceeds from the sale or liquidation of the Las Vegas Avenue Property after the amounts necessary to pay or reserve for in full (a) Allowed Claims secured by such property or other liens, security interests, or encumbrances on such property, (b) customary and ordinary costs of sale, including any brokerage commissions, (c) any taxes, fees and/or penalties caused or resulting from the sale of any of the Debtor's assets, including, without limitation, any capital gains tax; and (d) any other debts of Equaltox Management incurred in the ordinary course.

"<u>Lien</u>" means any lien, encumbrance, pledge or other charge against property.

"<u>Liquidation Analysis</u>" means the liquidation analysis setting forth what Holders of Allowed Claims will receive in a chapter 7 liquidation and attached to the Index as Exhibit "3."

"<u>Litigation Resolution Date</u>" means the later of (1) the date upon which a Final Order is entered resolving the Appeal, (2) the date upon which a Final Order is entered in any subsequent

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

appeal from the Appeal, and (3) the date upon which a Final Order is entered and any remanded or

further proceedings in or related to the Anthem Action.

"Lutfi" refers to Mahommed Lutfi.

"Masood" refers to Sulaiman Masood.

"Masood Available Cash" means the Masood SAM Funds and any Masood Net Sale

Proceeds remaining after the payment of Allowed Administrative Claims, Allowed Professional

Fee Claims, and Allowed Priority Unsecured Claims in full.

"Masood Net Sale Proceeds" means any Cash proceeds from the sale or liquidation of

Masood Real Properties after the amounts necessary to pay or reserve for in full (a) Allowed

Claims secured by such properties or other liens, security interests, or encumbrances on such

properties, (b) customary and ordinary costs of sale, including any brokerage commissions, and (c)

any taxes, fees and/or penalties caused or resulting from the sale of any of the Debtor's assets,

including, without limitation, any capital gains tax.

"Masood Real Properties" means any real property that Masood asserts an interest in,

including the Greenwich Property.

"Masood SAM Funds" means Masood's share of any proceeds distributed by SAM

Reinsurance on account of Masood's one-third membership interest therein after the payment of

debts of SAM Reinsurance incurred in the ordinary course and any taxes or expenses arising or

resulting from the dissolution of SAM Reinsurance or the distribution of proceeds to or on account

of Masood.

"Mercedes" refers to Mercedes-Benz Financial Services

"Monthly Payment Commencement Date" means the fifteenth day of the second full

calendar month after the Effective Date.

"Motion" means a request asking a judge to issue a ruling or order on a legal and/or

equitable matter.

"Net Recoveries" means any proceeds generated from the pursuit of Estate Claims, net of

all attorneys' fees and other costs necessary to recover such proceeds.

10128929.1

"Net Sale Proceeds" means proceeds received from the sale of any Estate Real Property after the amounts necessary to pay or reserve for in full (a) Allowed Claims secured by such property or other liens, security interests, or encumbrances on such property, (b) customary and ordinary costs of sale, including any brokerage commissions, and (c) any taxes, fees and/or penalties caused or resulting from such sale, including, without limitation, any capital gains tax.

"Non-Dischargeability Complaints" means the complaints filed by Anthem on February 2, 2024 against each of the Individual Debtors seeking a determination that the debt created by the Judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) and (6).

"Non-Ordinary Course Administrative Claim(s)" means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

"Ordinary-Course Administrative Claim" means Administrative Claims other than Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative Claims, based upon liabilities that Debtors incur in the ordinary course of their business.

"OUST" means the Office of the United States Trustee, Santa Ana Division.

"Payment Commencement Date" means the first Business Day of the first full calendar quarter after the Effective Date.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official committee appointed by the OUST, unofficial committee of creditors or equity holders, or entity.

"Petition Date" means October 24, 2023 as to Masood, the day that Masood filed his petition for relief under Chapter 11 of the Bankruptcy Code, and October 27, 2023 as to both Equaltox and Kohzad, the day that Equaltox and Kohzad filed their petitions for relief under Chapter 11 of the Bankruptcy Code.

"Plan" means the *Joint Chapter 11 Plan of Reorganization*, including as may be further amended or modified.

"Plan Projections" means the projections of the Debtors' post-confirmation payments under the Plan attached to the Index as Exhibit "1."

"Priority Unsecured Claim" means an Allowed Claim entitled to priority against an Estate under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

"Priority Tax Claim" means an Allowed Claim entitled to priority against an Estate under Bankruptcy Code § 507(a)(8).

"Pro Rata Payment" means the ratio (expressed as a percentage) of (i) the amount of an Allowed Unsecured Claim to (ii) the sum of the aggregate amounts of Allowed Unsecured Claims in the same Class (unless expressly stated otherwise in the treatment for such Allowed Unsecured Claim).

"Professional Fee Claim" means:

a.    A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred on an Estate's behalf, or

b.    A Claim either under Bankruptcy Code § 503(b)(4) for compensation for professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for expenses incurred in making a substantial contribution to an Estate.

"Purchase Option" means all terms in the Electric Avenue Property Lease related to the option of West Coast Alliance to purchase the Electric Avenue Property.

"Quarterly Distribution Date" means the Business Day selected by the Disbursing Agent, in his or her sole and absolute discretion, within forty-five (45) days after a particular calendar quarter to make a Distribution as required by the Plan.

"Reorganized Debtor" in the singular refers to either Equaltox, Masood, or Kohzad upon and after the Effective Date and as reorganized under the Plan, and, in the plural, refers collectively to Equaltox, Masood, and Kohzad upon and after the Effective Date and as reorganized under the Plan.

"Request for Payment" means a request for the allowance and payment of a Non-Ordinary Course Administrative Claim pursuant to 11 U.S.C. § 503(a).

"SAM Account" refers to the Non-Purpose Loan Collateral Account held by SAM.

"SAM Funds" refer to the funds on hand in the SAM Account in the approximate amount of $1,960,000.00.

"SAM Reinsurance" refers to SAM Reinsurance, Inc.

"Schedules" means the Schedules of Assets and Liabilities filed by the Debtors in each of the Cases, as required by § 521(a)(1) of the Code, Bankruptcy Rule 1007 (b)(l), and Official Bankruptcy Form No. 6, as the Schedules of Assets and Liabilities may have been or may be amended from time to time.

"Settlement Consideration" means Lutfi's interest in, or the proceeds resulting or arising from, SAM Reinsurance, the SAM Account, the SAM Funds, Equaltox Management, and the Las Vegas Avenue Property.

"SOFA" means the Statement of Financial Affairs filed by the Debtors in each of the Cases, as required by § 521(a)(1) of the Code and Bankruptcy Rules 1007(b)(l) as the Statement of Financial Affairs may have been or may be amended from time to time.

"Sunwest" refers to Sunwest Bank.

"Superior Court" means the Superior Court of California for the County of Orange.

"Tesla" refers to Tesla Motors Inc.

"Toyota" refers to Toyota Motor Credit Corp.

"Undeliverable Distribution" means a Distribution to any Holder of an Allowed Claim that is returned to the Liquidating Trustee as undeliverable or otherwise unclaimed.

"WSFS" refers to Wilmington Savings Fund Society, FSB, as Trustee of Trestle Titling Trust-1.

## B.    **Rules of Construction**

The rules of construction in Bankruptcy Code section 102 apply to this Disclosure Statement and the Plan.  For the purpose of this Disclosure Statement and the Plan, unless otherwise provided in this Disclosure Statement or the Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the

100

masculine, feminine and neuter; (iii) any reference in this Disclosure Statement or the Plan to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to this Disclosure Statement and the Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement and the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Disclosure Statement or the Plan, as the case may be; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure Statement or the Plan in its entirety rather than to a particular portion of this Disclosure Statement or the Plan, as the case may be; (vii) unless otherwise provided in this Disclosure Statement or the Plan, any reference in this Disclosure Statement or the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of this Disclosure Statement or the Plan, or any other provision in this Section.

## C.    Rules of Interpretation

Except as otherwise provided in the Plan, Bankruptcy Rule 9006(a) applies when computing any time period under the Plan.

Any term used in the Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

10128929.1

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms or as amended by the terms thereof.

Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

Unless otherwise specified, all references to Sections or Exhibits in the Disclosure Statement are references to this Disclosure Statement's Sections or Exhibits, and all references to Sections or Exhibits in the Plan are references to the Plan's Sections or Exhibits

Section captions and headings are used only as convenient references and do not affect this Disclosure Statement's or the Plan's meaning.

**D.    <u>Disclosure Statement Exhibits</u>**

The Exhibits to the Disclosure Statement—attached to the concurrently-filed Index—are as follows:

Exhibit 1 – Plan Projections (the Debtors' projection of payments under the Plan);

Exhibit 2 – Equaltox Projections (Equaltox's post-confirmation financial projections);

Exhibit 3 – Liquidation Analysis;

Exhibit 4 – Equaltox budget-to-actual comparison from Petition Date through and including January 27, 2024;

Exhibit 5 – Equaltox SOFA;

Exhibit 6 – Masood SOFA;

Exhibit 7 – Kohzad SOFA;

Exhibit 8 – Equaltox December 2023 MOR;

Exhibit 9 – Masood January 2024 MOR;

Exhibit 10 – Kohzad January 2024 MOR; and

Exhibit 11 – Plan Support Agreement.

DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN
10128929.1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **2/23/2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **2/23/2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **2/23/2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| **2/23/2024** | Ja'Nita Fisher | */s/ Ja'Nita Fisher* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **William H Brownstein    Brownsteinlaw.bill@gmail.com**
- **Joseph C Delmotte    ecfcacb@aldridgepite.com, JCD@ecf.inforuptcy.com;jdelmotte@aldridgepite.com**
- **Timothy W Evanston    tevanston@raineslaw.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com**
- **Lauren N Gans    lgans@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com**
- **Michael I. Gottfried    mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com**
- **Michael J Hauser    michael.hauser@usdoj.gov**
- **Wendy A Locke    ecfcacb@aldridgepite.com, wlocke@ecf.inforuptcy.com**
- **Robert S Marticello    rmarticello@raineslaw.com, bclark@raineslaw.com;jfisher@raineslaw.com**
- **Robert S McWhorter    rmcwhorter@buchalter.com, ewaldrop@buchalter.com;dpowers@buchalter.com**
- **Jessica Mickelsen Simon    simonjm@ballardspahr.com, carolod@ballardspahr.com;garciae@ballardspahr.com**
- **Jarrett S Osborne-Revis    josbornerevis@buchalter.com, ewaldrop@buchalter.com;dpowers@buchalter.com**
- **Christopher O Rivas    crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com**
- **Amitkumar Sharma    amit.sharma@aisinfo.com**
- **Michael Simon    msimon@raineslaw.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**
- **Michael M Wintringer    mike@sglwlaw.com, andrea@sglwlaw.com**
- **Roye Zur    rzur@elkinskalt.com, cavila@elkinskalt.com;lwageman@elkinskalt.com;1648609420@filings.docketbird.com**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**